## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

NUCOR CORPORATION,

*Defendant – Appellant*

UNITED STATES, STEEL DYNAMICS, INC.

*Defendants*,

v.

KG DONGBU STEEL CO., LTD., DONGBU STEEL CO., LTD.,
DONGBU INCHEON STEEL CO., LTD.,

*Plaintiffs – Appellees*

Appeal from the United States Court of International Trade in
Case No. 1:22-CV-00047, Judge Jennifer Choe-Groves

## OPENING BRIEF OF DEFENDANT-APPELLANT NUCOR CORPORATION

Alan H. Price, Esq.
Christopher B. Weld, Esq.
Tessa V. Capeloto, Esq.
Adam M. Teslik, Esq.
Enbar Toledano, Esq.

**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
202-719-7000

*Counsel to Nucor Corporation*

Dated: April 7, 2025

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---:|:---|
| **Case Number** | 2025-1411 |
| **Short Case Caption** | KG Dongbu Steel Co., v. United States |
| **Filing Party/Entity** | Nucor Corporation - Appellant |

---

**Instructions:**

1.  Complete each section of the form and select none or N/A if appropriate.

2.  Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3.  In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4.  Please do not duplicate entries within Section 5.

5.  Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 02/18/2025

Signature: /s/ Alan H. Price

Name: Alan H. Price

| 1. **Represented Entities.** Fed. Cir. R. 47.4(a)(1). | 2. **Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | 3. **Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Nucor Coporation | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Alan H. Price | Derick G. Holt | Robert E. DeFrancesco, III |
| Adam M. Teslik | Enbar Toledano | Tessa V. Capeloto |
| Christopher B. Weld | Paul A. Devamithran | Theodore P. Brackemyre |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION .................................................................................1

II.   STATEMENT OF RELATED CASES ....................................................6

III.  JURISDICTIONAL STATEMENT .......................................................7

IV.  STATEMENT OF THE ISSUES ..........................................................7

V.    STATEMENT OF THE CASE ..............................................................8

VI.  STATEMENT OF FACTS ....................................................................9

     A.    Legal Framework .......................................................................9

          1.    Countervailability of Debt-to-Equity Conversions....................9

          2.    Calculation of Non-Recurring Benefits .....................................11

     B.    Dongbu's Debt Restructuring Program...............................................12

     C.    Commerce's Prior Benefit Determinations........................................15

     D.    Commerce's Benefit Determinations in this Review...........................16

     E.    CIT and Remand Proceedings.............................................................18

VII. SUMMARY OF ARGUMENT..................................................................20

VIII. ARGUMENT............................................................................................22

     A.    Legal Standards ...................................................................................22

     B.    Commerce Lawfully Reevaluated the Countervailability
          of Dongbu's First Three Debt-to-Equity Conversions........................23

          1.    Commerce's Final Results Easily Satisfied the
                Standard for a Change in Agency Position..............................25

          2.    The CIT's First Remand Order Was Contrary to
                Law.............................................................................................31

          3.    The CIT's Second Remand Order Was Contrary to
                Law and Imposed an Improperly Limited Remand.................36

     C.    Commerce's Benefit Determination Was Supported by
          Substantial Evidence ...........................................................................39

          1.    Commerce's Benefit Determination Was Supported
                by Substantial Evidence...........................................................41

2.    The CIT Did Not Reach the Substantiality of the Evidence Underlying Commerce's Benefit Determination.................................................................45

D.    Commerce's Pass-Through Determination Was Supported by Substantial Evidence ......................................................................48

1.    Commerce's Pass-Through Determination Was Supported by Substantial Evidence .........................................50

2.    The CIT Did Not Reach the Substantiality of the Evidence Underlying Commerce's Pass-Through Determination.........................................................................53

IX.    CONCLUSION...............................................................................................55

**<u>CONFIDENTIAL MATERIAL OMITTED</u>**

Pursuant to Federal Circuit Rules 25.1(d) and 25.1(e)(1)(B), this brief contains confidential material that has been omitted. The confidential material omitted from pages 13-15, 27, 30, 39, and 41- 43 consists of specific dollar figures supplied by the respondent parties during the review, and specific ownership interests and types of business relationships associated with certain respondent parties.

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Silicon Techs. v. United States*,
    334 F.3d 1033 (Fed. Cir. 2003) ................................................................23, 38

*Am. Trucking Ass'ns v. Atchison, Topeka & Santa Fe Railway Co.*,
    387 U.S. 397 (1967)................................................................24, 36

*Arkema Inc. v. EPA*,
    618 F.3d 1 (D.C. Cir. 2010)................................................................26

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*, 5 F.4th 1367 (Fed. Cir. 2021) ................................................................47

*Changzhou Wujin v. United States*,
    701 F.3d 1367 (Fed. Cir. 2012) ................................................................38

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)................................................................*passim*

*Huvis Corp. v. United States*,
    570 F.3d 1347 (Fed. Cir. 2009) ................................................................26

*Hynix Semiconductor Inc. v. United States*,
    425 F. Supp. 2d 1287 (Ct. Int'l Trade 2006) ................................................................10

*Hyundai Heavy Indus., Co. v. United States*,
    332 F. Supp. 3d 1331 (Ct. Int'l Trade 2018) ................................................................54

*Inland Steel Indus., Inc. v. United States*,
    188 F.3d 1349 (Fed. Cir. 1999) ................................................................47

*Mid Continent Steel & Wire, Inc. v. United States*,
    941 F.3d 530 (Fed. Cir. 2019) ................................................................23, 26

*Nat'l Ass'n of Home Builders v. EPA*,
    682 F.3d 1032 (D.C. Cir. 2012)................................................................33, 38

*Nat'l Cable & Telecomms. Ass'n v. FCC*,
    567 F.3d 659 (D.C. Cir. 2009)................................................................25

*Nat'l Res. Def. Council v. Nat'l Marine Fisheries Serv.*,
    71 F. Supp. 3d 35 (D.D.C. 2014)................................................................34, 38

*New England Power Generators Ass'n, Inc. v. FERC*,
    879 F.3d 1192 (D.C. Cir. 2018)...........................................................................33

*NSK Ltd. v. United States*,
    919 F. Supp. 442, (Ct. Int'l Trade 1996) ...........................................................52

*Nucor Corp. v. United States*,
    494 F. Supp. 3d 1377 (Ct. Int'l Trade 2021) ...............................................44, 45

*Riffin v. Surface Transp. Bd.*,
    733 F.3d 340 (D.C. Cir. 2013)............................................................................24

*Simio, LLC v. FlexSim Software Prods., Inc.*,
    983 F.3d 1353 (Fed. Cir. 2020) ..........................................................................40

*Sunpreme Inc. v. United States*,
    946 F.3d 1300 (Fed. Cir. 2020) (*en banc*)...........................................22, 23, 40

*Ta Chen Stainless Steel Pipe, Inc. v. United States*,
    298 F.3d 1330 (Fed. Cir. 2002) ...................................................................46, 54

*Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*,
    975 F.2d 807 (Fed. Cir. 1992) ..............................................................................8

*Worldwide Door Components, Inc. v. United States*,
    119 F.4th 959 (Fed. Cir. 2024) ...........................................................46, 47, 54

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)....................................................................................23

19 U.S.C. § 1677(5)(B) ...............................................................................................9

19 U.S.C. § 1677(5)(D)(i) ...........................................................................................9

19 U.S.C. § 1677(5)(E)(i) ............................................................................................9

28 U.S.C. § 1295(a)(5).................................................................................................7

28 U.S.C. § 1581(c) .....................................................................................................7

**Regulations**

19 C.F.R. § 351.507(a)................................................................39, 43, 44

19 C.F.R. § 351.507(a)(2)(i) ..................................................................10

19 C.F.R. § 351.507(a)(2)(iii) ..........................................................10, 41

19 C.F.R. § 351.507(a)(3)(i) ..................................................................10

19 C.F.R. § 351.508(a)............................................................................9

19 C.F.R. § 351.524(b)(1)......................................................................11

19 C.F.R. § 351.524(c)(1)......................................................................11

19 C.F.R. § 351.524(d)(1)......................................................................11

**Administrative Materials**

*Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea*, 77 Fed. Reg. 17,410 (Dep't Commerce Mar. 26, 2012) ....................10

*Certain Aluminum Foil from the People's Republic of China*, 86 Fed. Reg. 12,171 (Dep't Commerce Mar. 2, 2021)......................................34

*Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 86 Fed. Reg. 29,237 (Dep't Commerce June 1, 2021)..............16, 17, 18

*Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 85 Fed. Reg. 15,112 (Dep't Commerce Mar. 17, 2020)........................16

*Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 84 Fed. Reg. 11,749 (Dep't Commerce Mar. 28, 2020)........................16

*Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China*, 80 Fed. Reg. 34,888 (Dep't Commerce June 18, 2015) .........................................................................................12

*Certain Pasta from Italy*, 70 Fed. Reg. 17,971 (Dep't Commerce Apr. 8, 2005) ......................................11

*Certain Softwood Lumber Products from Canada*, 89 Fed. Reg. 67,062 (Dep't Commerce Aug. 19, 2024)..............................34, 35

*Countervailing Duties*,
 63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998)......................................9

*Dynamic Random Access Memory Semiconductors from the Republic*
 *of Korea*, 68 Fed. Reg. 37,122 (Dep't Commerce June 23, 2003)....................10

*Notice of Final Modification of Agency Practice Under Section 123 of*
 *the Uruguay Round Agreements Act*, 68 Fed. Reg. 37,125 (Dep't
 Commerce June 23, 2003) .........................................................................*passim*

# I.   <u>INTRODUCTION</u>

On behalf of Defendant-Appellant Nucor Corporation ("Nucor"), we respectfully submit this opening brief in support of Nucor's appeal from the judgments of the U.S. Court of International Trade ("CIT") in *KG Dongbu Steel Co., Ltd. v. United States*, Case No. 22-00047, slip ops. 23-098 (July 7, 2023), 24-038 (Apr. 3, 2024), and 25-007 (Jan. 17, 2025).   This appeal relates to the U.S. Department of Commerce's ("Commerce") fourth administrative review of the countervailing duty order on *Certain Corrosion-Resistant Steel Products from the Republic of Korea* (the "Order"), corresponding to calendar year 2019.

During the period of review at issue in this appeal, Plaintiff-Appellee KG Dongbu Steel Co., Ltd. ("Dongbu")[1] had been in severe financial distress for over a decade, during which it received extensive financial support from government institutions.   From 2014 through 2019, Dongbu participated in a corporate restructuring program, pursuant to which it received a series of loans and debt-to-equity conversions through creditors committees consisting of both private and government-owned investors.   Commerce has consistently found, and continued to find in this proceeding, that the creditors committees are controlled by the Korean government.   As a result, the agency has consistently countervailed the restructured

---

[1]    Plaintiffs-Appellees are KG Dongbu Steel Co., Ltd., its predecessor KG Steel Co., Ltd., and affiliate Dongbu Incheon Steel Co., Ltd.   For ease of reference, we refer to these entities collectively as "Dongbu."

loans that Dongbu received from government financial institutions pursuant to the restructuring program. But in the first three administrative reviews of the Order, Commerce found three debt-to-equity conversions—facilitated by the same committees and pursuant to the same program—provided Dongbu no benefit. Those determinations rested on a finding that Dongbu's creditors committees had acted like reasonable commercial investors in the course of those transactions.

In this underlying review, Commerce reconsidered. During the period of review, Dongbu's creditors committee approved a fourth debt-to-equity conversion under the same restructuring program. The circumstances of that transaction were illuminating: a newly commissioned report demonstrated that, despite all the prior bailouts, Dongbu was in increasingly poor financial health. Indeed, the report demonstrated that Dongbu's creditors committee had set specific financial targets in connection with the first three debt-to-equity conversions, which Dongbu had systematically failed to achieve. Moreover, for the first time in any period of review, a private investor—independent from the creditors committee—invested in the latest debt-to-equity conversion. That investor refused to invest in Dongbu without significant concessions, including that an additional KRW ("₩") 605 billion (more than $400,000,000) be removed from Dongbu's balance sheets, and that maturities and interest rates on Dongbu's debts be extended and reduced.

Upon consideration of that new information, Commerce reevaluated its prior determinations and concluded that it had made a "mistake." The private investor's refusal to invest in Dongbu absent significant concessions, and the picture painted by Dongbu's financial report, demonstrated that commercially reasonable investors would not have invested in Dongbu on the terms of the first three debt-to-equity conversions. Upon further analysis, Commerce confirmed that the creditors committees' private investors had not in fact exercised independent judgment in the past, but rather had no alternative but to accept the terms imposed upon them by the committees' government-controlled banks. Commerce also concluded that its prior findings had been internally inconsistent: that is, it "would be unreasonable for {Commerce} to find that {government controlled institutions} exercised significant influence over the loans, but not the debt-to-equity conversions." Appx8774. Accordingly, Commerce reevaluated its determinations that the first three debt-to-equity conversions had provided no benefit.

Importantly, Commerce did not disturb the results of its prior determinations, *i.e.*, did not look back and reassess duties in connection with the concluded reviews. But Commerce did consider whether any of the earlier conversions continued to benefit Dongbu in the underlying period of review. *See* Appx8781 (explaining that "Commerce allocates the benefits received from certain types of subsidies over time," including "equity infusions" specifically). Upon thorough consideration of

the record, Commerce determined (1) the first three debt-to-equity conversions did continue to benefit Dongbu and (2) such benefits passed through to Dongbu even after a change in ownership. The pass-through determination was based primarily on the fact that Dongbu had the option, but specifically declined, to rebut Commerce's standard presumption that such benefits survive an acquisition.

Dongbu appealed Commerce's determinations to the CIT, which reversed them. With regard to Commerce's change in position on the first three debt-to-equity conversions, the CIT held that Commerce had "failed to provide an adequate explanation for its decision to deviate from its prior determinations," rendering that decision "arbitrary and not in accordance with law." Appx13. In particular, the CIT found that Commerce "neither provided a sufficient explanation nor cited new information on the record that relates to whether the first three debt-to-equity restructurings provided a countervailable benefit." Appx11.[2] The court thus remanded Commerce's benefit determinations and the related determination that such benefits passed through to Dongbu. Appx13–15.[3]

---

[2]  Unless otherwise noted, all emphasis in this Brief has been added, and all internal citations, quotations, and alterations have been omitted.

[3]  On appeal to the CIT, Dongbu also challenged the uncreditworthy benchmark rate and unequityworthy discount that Commerce applied in its calculations, which are not at issue in this appeal.

On remand, Commerce expressly acknowledged its change in position as the correction of a "mistake," and provided still more explanation for its reassessment—fully satisfying the agency's obligations to defend a change in position under controlling law. *See FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009). Notwithstanding the change in position, Commerce also amply demonstrated that both its benefit and pass-through determinations were supported by substantial record evidence, including new evidence supporting the benefit determination specifically. *See* Appx9044.

But the CIT remanded again. The court was "not convinced that Commerce's prior determinations … were 'mistakes,'" and expressly prohibited Commerce from continuing to find a benefit "absent new information to address fraud or mistake in fact." *See* Appx41–44. With regard to the substantial evidence supporting Commerce's benefit determination, the CIT did not address Commerce's extensive re-evaluation of the facts. Instead, the court concluded in a single paragraph that, because the agency had previously determined "private creditors in the debt-to-equity swaps were significant," a contrary finding now could not be supported by substantial evidence. Appx43. The CIT did not engage with Commerce's thorough pass-through analysis either, but rather remanded for specific consideration of Dongbu's proffered arguments and facts. Appx44–50.

Left with no path to issue a determination based on its own judgment, Commerce issued a second remand redetermination under protest, finding the first three debt-to-equity conversions provided no countervailable benefit, mooting the pass-through determination. Appx21–22. The CIT affirmed. Appx62–63.

Nucor respectfully appeals from the CIT's remand orders and ultimate affirmance of an agency determination issued under protest and pursuant to an erroneously limited remand. In both the Final Results and the First Remand Redetermination, Commerce plainly satisfied the Supreme Court's standard for changes in agency position. In imposing an ad hoc, heightened legal standard—requiring first new information, and then new information specifically demonstrating fraud or mistake of fact—the CIT erred. Furthermore, in overlooking Commerce's careful evaluation of record evidence, and reweighing the record for itself, the CIT likewise exceeded its authority under substantial-evidence review. Commerce's lawful and factually supported original determinations should thus be reinstated and the CIT's remand orders reversed.

## II.    STATEMENT OF RELATED CASES

Counsel for Nucor is unaware of any other appeal from the same civil action that has previously been before this or any other appellate court. However, the outcome of this appeal will likely bear on two proceedings pending before the CIT.

The issues raised in this appeal, related to the administrative review of the Order for calendar year 2019, also arose in the two subsequent administrative reviews for 2020 and 2021. Those agency determinations, and attendant issues, have been appealed to the CIT in *KG Dongbu Steel Co., Ltd. v. United States*, Case No. 23-cv-00055, and *KG Dongbu Steel Co., Ltd. v. United States*, Case No. 24-cv-00056. In light of the similarity of the issues in the three proceedings, the CIT has stayed Case Nos. 23-cv-00055 and 24-cv-00056 pending the final and conclusive resolution of this appeal.

## III.   JURISDICTIONAL STATEMENT

This is an appeal from the final judgment of the CIT in *KG Dongbu Steel Co., Ltd., et al. v. United States*, entered on January 17, 2025. The CIT exercised jurisdiction pursuant to 28 U.S.C. § 1581(c). On February 4, 2025, within sixty days of the CIT's final judgment, Nucor timely filed its notice of appeal pursuant to Federal Circuit Rule 4. This Court's jurisdictional grant to review the CIT's final judgment is provided in 28 U.S.C. § 1295(a)(5).

## IV.   STATEMENT OF THE ISSUES

This appeal raises the following issues:

1.      Whether the CIT erred in remanding Commerce's determination that the first three debt-to-equity conversions provided a countervailable benefit to Dongbu, where binding precedent grants administrative agencies considerable

discretion to revisit prior determinations and Commerce's determination was supported by substantial evidence and otherwise in accordance with law.

2.     Whether the CIT erred in remanding Commerce's determination that the benefits from the first three debt-to-equity conversions passed through to Dongbu, where Commerce's determination was supported by substantial evidence and otherwise in accordance with law.

## V.     **STATEMENT OF THE CASE**

Nucor appeals from the CIT's first and second remand orders, remanding Commerce's reasonable and lawful determinations with regard to Dongbu's debt-to-equity conversions.  Underlying the CIT's remand orders was a mistaken belief that Commerce is prohibited from "revisit{ing}" prior determinations "absent new information to address fraud or mistake of fact."  Appx43–44.  But the Supreme Court has confirmed that administrative agencies have considerable discretion to revisit past determinations, with or without new evidence and in circumstances far short of fraud.  *See FCC*, 556 U.S. at 515.  In further rejecting Commerce's reasoned factual determinations as not "persuasive" and reweighing record evidence for itself, the CIT's substantial evidence determinations were likewise unlawful.  *See, e.g.*, *Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975 F.2d 807, 815 (Fed. Cir. 1992).  The CIT's erroneous and improper limited remands should

thus be reversed, and Commerce's reasonable and lawful determinations should be reinstated.

## VI. STATEMENT OF FACTS

### A. Legal Framework

#### 1. Countervailability of Debt-to-Equity Conversions

A countervailable subsidy, in relevant part, is "the case in which an authority provides a financial contribution … to a person and a benefit is thereby conferred." 19 U.S.C. § 1677(5)(B). A "financial contribution" includes "the direct transfer of funds," including "equity infusions" specifically. *Id.* § 1677(5)(D)(i); *see also* 19 C.F.R. § 351.508(a) (providing that debt-to-equity conversions are treated as equity infusions for purposes of a benefit analysis).

An equity infusion confers a benefit "if the investment decision is inconsistent with the usual investment practice of private investors … in the country in which the equity infusion is made." 19 U.S.C. § 1677(5)(E)(i). This inquiry "is divided into two methodological tracks, with the choice of methodology dependent upon whether or not actual private investor prices can serve as a benchmark for the shares purchased by the government." *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,372 (Dep't Commerce Nov. 25, 1998). If "actual private investor prices (*i.e.*, market prices)" are available, *id.*, Commerce "will consider an equity infusion as being inconsistent with usual investment practice … if the price paid by the government

9

for newly issued shares is greater than the price paid by private investors" for the same or similar shares, 19 C.F.R. § 351.507(a)(2)(i).

However, if "private investor purchases of newly issued shares are not significant," *id.* § 351.507(a)(2)(iii), Commerce will not rely on such purchases for its determination, *see* Issues and Decision Memorandum accompanying *Dynamic Random Access Memory Semiconductors from the Republic of Korea*, 68 Fed. Reg. 37,122 (Dep't Commerce June 23, 2003) at 90 (sustained in *Hynix Semiconductor Inc. v. United States*, 425 F. Supp. 2d 1287, 1312 (Ct. Int'l Trade 2006)). That is the case where, *e.g.*, the share of private investor purchases is relatively small, *id.*, or where private investors are unable to significantly influence the terms on which government investors purchased shares (*i.e.*, where government investors controlled the terms of the transaction), *see, e.g.*, Issues and Decision Memorandum accompanying *Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea*, 77 Fed. Reg. 17,410 (Dep't Commerce Mar. 26, 2012) at 100 ("*Refrigerator-Freezers from Korea* IDM"). When "actual private investor prices" (*i.e.* market prices) are unavailable or insignificant, Commerce uses the second "methodological track" and proceeds to ask whether the equity infusion recipient was equityworthy. 19 C.F.R. § 351.507(a)(3)(i).[4]

---

[4]     Because Dongbu did not challenge Commerce's determinations that it was not equityworthy, the equityworthiness standard is not at issue in this appeal and thus is not separately discussed.

## 2. Calculation of Non-Recurring Benefits

Equity infusions and debt-to-equity conversions are normally treated as "non-recurring" subsidies. 19 C.F.R. § 351.524(c)(1). Commerce "will normally allocate a non-recurring benefit to a firm over the number of years corresponding to" its average useful life ("AUL"). *Id.* § 351.524(b)(1), (d)(1).

When a recipient of non-recurring subsidies is acquired during the AUL period, Commerce applies a "baseline presumption" that non-recurring benefits pass through to the post-acquisition entity. *Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act*, 68 Fed. Reg. 37,125, 37,127 (Dep't Commerce June 23, 2003). This presumption may be rebutted by a showing that "during the allocation period, a {change-in-ownership} occurred in which {a firm} sold its ownership of all or substantially all of a company or its assets, retaining no control of the company or its assets, and that the sale was an arm's length transaction for fair market value." *Id.*; *see also Certain Pasta from Italy*, 70 Fed. Reg. 17,971, 17,972 n.2 (Dep't Commerce Apr. 8, 2005) (explaining that same methodology applies to both government privatizations and other changes in ownership).

Because this analysis requires information beyond what is requested in the standard countervailing duty questionnaire, Commerce asks respondents at the outset of investigations or reviews to confirm whether they have changed ownership

and wish to challenge the baseline presumption. If they do, Commerce instructs them to respond to a "change-in-ownership" appendix to the standard questionnaire. *See, e.g.*, Issues and Decision Memorandum accompanying *Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China*, 80 Fed. Reg. 34,888 (Dep't Commerce June 18, 2015) at 72 n.314 (explaining the appendix "provides a complete list of the information the Department requires to conduct … {a change-in-ownership} analysis"). If a respondent does not challenge the baseline presumption or respond to the change-in-ownership appendix, Commerce presumes that non-recurring benefits passed through to the post-acquisition firm. *See, e.g.*, *id.*

## B.    Dongbu's Debt Restructuring Program

The period of review in this segment coincided with the conclusion of a long-term effort to rescue Dongbu from otherwise insurmountable financial distress and prevent the company's liquidation. Led by Korea Development Bank ("KDB"), one of Korea's primary state-owned policy financial institutions, the effort began in 2013 and ended during the period of review with an equity investment by a group of investors called the KG Consortium.

Dongbu began to experience financial distress in late 2013, when its credit ratings deteriorated and it was unable to repay its outstanding debts. Appx458–459. To repay maturing liabilities and obtain operating capital, Dongbu applied for and

received three KDB bridge loans of ₩[ # ] billion, ₩[ # ] billion, and ₩[ # ] billion between December 2013 and June 2014. Appx 459–461. Dongbu and KDB also entered into an arrangement called the "Special Agreement for Corporate Bond Refinancing Issuance," which resulted in KDB and other Korean government institutions assuming approximately ₩[ # ] billion in Dongbu's outstanding liabilities from the company's original creditors. *See* Appx460.

KDB was also actively involved in spinning off and attempting to sell certain of Dongbu's assets. Specifically, KDB acquired and sold a Dongbu affiliate, and attempted to sell Dongbu's Incheon facility and port management arm. Appx461. But that sale fell through after the intended purchaser conducted financial due diligence, as a result of which Dongbu was unable to repay its creditors. Appx461–462.

Consequently, Dongbu entered a corporate restructuring program. Dongbu was not restructured via formal bankruptcy procedures. Appx462. Instead, the restructuring process involved a series of ad hoc negotiations between Dongbu and its creditors between 2014 and 2019. Appx462–486. Decisions on the creditors' part were made based on a [ *percent stake* ] of participating financial institutions, with voting shares allocated based on the institutions' shares of Dongbu's total outstanding debt. Appx499. Throughout the restructuring process, Dongbu's creditor committees were dominated by Korean government institutions,

which controlled more than the [ *percent stake* ] needed to control the committees' decisions.  *See* Appx487–491; Appx8542–8545.

Dongbu's debt restructuring consisted of four rounds of revised loan terms and debt-to-equity conversions.  The first began in 2014 and included reduction of interest rates on existing secured and unsecured loans, ₩160 billion in new loans, and a debt-to-equity conversion of ₩53 billion.  Appx464–465, Appx478–479, Appx487–488.  But Dongbu's financial performance continued to deteriorate, resulting in further restructuring in 2016.  The second round included another reduction of interest rates on outstanding loans and another debt-to-equity conversion of ₩200 billion.  Appx468–469, Appx479, Appx488–489.  Dongbu's financial performance deteriorated still.  Appx470–471.  The third restructuring began in 2017 and included an extension of maturities on outstanding loans and a third debt-to-equity conversion of ₩200 billion.  Appx470–472, Appx480–481, Appx489–490.  Throughout this process, Dongbu's value both in liquidation and as a going concern decreased, the company failed to achieve performance objectives, and it was nearly forced to delist from the Korean stock exchange multiple times. *See* Appx463–472; *see also* Appx8462–8468.

The fourth and final round of debt restructuring coincided with a renewed attempt by the creditor committee financial institutions to find Dongbu an external buyer.  During the bidding process, three companies submitted preliminary bids, two

of whom "gave up and did not submit final bidding proposal," leaving only one potential buyer, the KG Consortium.  Appx473–474.

Despite the fact that Dongbu had received three prior rounds of significant debt restructuring, the KG Consortium was unwilling to invest in Dongbu based on the company's current financial position.  Instead, the KG Consortium demanded even further interest rate reductions and maturity extensions on outstanding loans, and an additional debt-to-equity conversion.  Appx474.  Specifically, the KG Consortium acquired a [ *percent* ] stake in Dongbu, only after the creditor committee financial institutions provided another ₩605 billion in debt-to-equity conversions, further reduced interest rates and extended maturities on remaining debt, and a KDB-affiliated investment fund provided a last-minute injection of capital.  *See* Appx7465–7468; Appx7668, Appx7682–7705, Appx7727–7730, Appx7745–7768, Appx7787–7894.  On this basis, the fourth round of debt restructuring began in June 2019 and consisted of the agreed-upon debt-to-equity conversion of ₩605 billion, interest rate reductions, and extensions of loan maturities.  Appx475–476.

## C.  Commerce's Prior Benefit Determinations

In the three administrative reviews before this one, Commerce determined that the loan side of Dongbu's debt restructuring program conferred a benefit, while the debt-to-equity conversions under the same restructuring program did not.

Commerce's determinations rested on findings that private investor participation in the first three conversions had been significant, *i.e.*, that the private institutions on Dongbu's creditors committees had acted as commercially reasonable, independent investors. And, because those private institutions paid the same share price as the government-owned institutions in Dongbu's creditors' committee, Commerce concluded that the transaction met the private investor standard and conferred no benefit. *See* Issues and Decision Memorandum accompanying *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 86 Fed. Reg. 29,237 (Dep't Commerce June 1, 2021) at 38; *see also* Issues and Decision Memorandum accompanying *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 85 Fed. Reg. 15,112 (Dep't Commerce Mar. 17, 2020) at 36–37 (same); Issues and Decision Memorandum accompanying *Certain Corrosion-Resistant Steel Products from the Republic of Kore*a, 84 Fed. Reg. 11,749 (Dep't Commerce Mar. 28, 2020) at 34 (same). Commerce emphasized, however, that its conclusion was subject to reconsideration in future reviews. *See* Issues and Decision Memorandum accompanying *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, 86 Fed. Reg. 29,237 (Dep't Commerce June 1, 2021) at 38.

### D. Commerce's Benefit Determinations in this Review

In this review, Commerce came to a different determination. In evaluating the fourth debt-to-equity conversion, which took place during the period of review,

Commerce noted the first-time participation of a private, <u>independent</u> investor: the KG Consortium, which was not a member of Dongbu's government-led creditors committees. Appx8773. Commerce determined that the KG Consortium's investment constituted a "significant" investment by an actual private investor and thus used the KG Consortium's share prices to determine whether government investors had acted according to the private investor standard. Appx8514. Because the KG Consortium purchased Dongbu's shares at a lower price than the Korean government banks on the creditors' committees, Commerce determined that the fourth debt-to-equity conversion conferred a benefit on Dongbu. *Id.*; Appx8564–8565. (That determination was not appealed).

The KG Consortium's weighty conditions on investment in Dongbu caused Commerce to reconsider its earlier determinations that the first three debt-to-equity conversions had been consistent with the private investor standard. Appx8773. Upon reevaluation, Commerce realized that "the private investors on the creditors councils {had} not evaluate{d} the reasonableness of the rate of return on any equity they were considering investing in the company." Appx8507–8508. Instead, they were only "considering how best to limit their losses and maximize the recovery" of funds previously lent to Dongbu. Appx8508. Thus, consistent with its determinations on the loan side of the debt restructuring program, Commerce found that government banks "control{led} the decisions relating to {Dongbu's}'s debt

restructuring," rendering private creditors' participation "not significant." *Id.* In support of these determinations, Commerce issued a detailed analysis memorandum dedicated exclusively to the issue of Dongbu's debt-to-equity conversions. *See generally* Appx8538–8558.

Commerce thus proceeded to an equityworthiness analysis and determined that Dongbu was not equityworthy during any of the four debt-to-equity restructurings. (That determination also was not appealed). As a result, Dongbu's equity infusions by the Korean government banks were determined to be countervailable in full. Appx8511–8514. Because Dongbu specifically reported that it had not changed ownership during the AUL period, and did not wish to challenge the baseline presumption regarding allocation of non-recurring subsidies, Appx223, Commerce applied its presumption that non-recurring subsidies passed through (*i.e.*, survived) the KG Consortium's acquisition. Appx8780–8783.

### E. CIT and Remand Proceedings

Dongbu appealed Commerce's determinations to the CIT, alleging in relevant part that Commerce (1) unlawfully revisited its prior determinations, Appx8, and (2) failed to sufficiently consider evidence with respect to the potential extinguishment of non-recurring subsidies post-acquisition. Appx14. The court agreed with Dongbu on both counts. On the first point, it held that "Commerce has a standard practice of not reexamining the countervailability of Plaintiff's equity

infusions absent new information," and that "the record evidence cited by Commerce as justification for its deviation from its past practice does not deal directly with the first through third debt-to-equity restructurings and is not a sufficient explanation to justify departing from its standard practice." Appx11–12. The CIT did not address the merits of the pass-through determination, but rather remanded it summarily. Appx14–15.

On remand, Commerce provided additional explanation for its reconsideration and its finding that the KG Consortium's investment had not extinguished non-recurring benefits. Commerce explained that it "had made a mistake in the prior review" and "realized that {its} prior finding that no benefit was conferred by the first three debt-to-equity restructurings was inconsistent with 19 CFR 351.507." Appx9044; Appx9047 (explaining, per regulation, that Commerce's "practice in analyzing the significance of private investor participation is to conduct the analysis from the perspective of an outside private investor, not an existing investor that is simply trying to minimize its losses"). With respect to the pass-through determination, Commerce explained that "KG Dongbu explicitly declined to rebut" the baseline presumption that recurring subsidies survived the change in ownership. Appx9050.

The court rejected Commerce's additional explanations. It held again that Commerce's determination was "arbitrary and not supported by substantial

evidence" because Commerce had not pointed to sufficiently <u>new</u> information, suggesting that "Commerce's purported 'mistakes' are excuses for Commerce's abrupt change in agency practice…." Appx37, Appx 42.  Remanding again, the CIT ordered that "Commerce may not attempt to reverse the countervailability determinations on the first three administrative reviews in this case absent new information to address fraud or mistake of fact."  Appx44.  Notwithstanding Dongbu's election not to respond to the change-in-ownership appendix, the court also held that the application of Commerce's pass-through presumption "is not reasonable and is not responsive to the prior remand Order."  Appx45.  The court thus remanded with instructions for Commerce to address every argument and piece of information that Dongbu cited.  Appx50.

Commerce issued its Second Remand Results under respectful protest, stating "we find no other basis on the record to conclude that a benefit was conferred on Dongbu Steel's debt-to-equity infusions," rendering the extinguishment issue moot as a result.  Appx9214, Appx9216.  The CIT sustained the Second Remand Results over Nucor's objection.  This appeal followed.

## VII.  <u>SUMMARY OF ARGUMENT</u>

Commerce both reasonably explained and amply supported its determinations that Dongbu's first three debt-to-equity conversions conferred a countervailable benefit to Dongbu and that such benefit survived an acquisition.  Because the CIT's

remand orders applied erroneous legal standards and exceeded the court's limited authority on substantial evidence review, they should be reversed and Commerce's original determinations reinstated.

*First*, in reevaluating the countervailability of Dongbu's first three debt-to-equity conversions, Commerce expressly "display{ed} awareness that it {was} changing position" and showed "good reasons" for the change, satisfying the Supreme Court's standard for reconsideration of administrative agency action. *See Fox*, 556 U.S. at 514–15. The CIT's heightened requirements that Commerce first identify new information to justify such reconsideration, and then new evidence specifically demonstrating fraud or mistake of fact, were contrary to law and thus reversible error.

*Second*, setting aside Commerce's lawful change in position, substantial evidence supported Commerce's benefit determination itself. Commerce identified overwhelming record evidence demonstrating the Korean government's domination of Dongbu's creditors committee, rendering the participation of private investors insignificant. Commerce also explained how that finding was consistent with both agency and judicial precedents, including earlier reviews involving Dongbu's creditors committee and the same restructuring program. On appeal, the CIT did not address that evidence, remanding instead based on Commerce's change of mind.

Because Commerce's benefit determination was amply supported by substantial evidence, it should be reinstated and affirmed.

*Third*, substantial evidence also supported Commerce's determination that the benefits from the equity infusions were not extinguished by a change in ownership during the period of review. Commerce presumes that non-recurring subsidies continue to benefit the recipient over the period of their AUL, but gives respondents an opportunity to rebut that presumption with specific evidence. Here, Dongbu expressly stated that it did not wish to rebut Commerce's presumption. Accordingly, Commerce was neither obligated nor able to fully consider whether an acquisition of Dongbu extinguished any prior benefits conferred. In any event, record evidence demonstrated that it did not, *i.e.*, that Dongbu failed to establish those investments were arm's-length transactions for fair market value. The CIT did not engage with the substantiality of this evidence, but the record provides ample grounds for this Court to reinstate Commerce's determination and to affirm.

## VIII. <u>ARGUMENT</u>

### A. <u>Legal Standards</u>

The Court of Appeals for the Federal Circuit reviews decisions of the CIT *de novo*, replicating the CIT's review of the challenged agency determination. *See Sunpreme Inc. v. United States*, 946 F.3d 1300, 1308 (Fed. Cir. 2020) (*en banc*). Under that standard, the Court will affirm Commerce's determinations unless they

are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *see also Sunpreme*, 946 F.3d at 1308. Because the Federal Circuit reviews Commerce's determinations *de novo*, it is not always necessary on appeal to review the adequacy of the lower court's decision. However, where the CIT issues a limited remand, directing Commerce to modify its analysis in accordance with the court's instructions, the remand order is itself subject to this Court's review. *See, e.g.*, *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1037 (Fed. Cir. 2003) ("A review of the entire administrative record puts before this court both the trial court's remand order instructing Commerce to calculate CBCC's interest expenses without reference to its ultimate parent and the trial court's acceptance of that specifically limited dumping calculation.").

### B. Commerce Lawfully Reevaluated the Countervailability of Dongbu's First Three Debt-to-Equity Conversions

Administrative agencies are empowered to change their minds. And the standard for doing so is well-established: (1) the agency must "display awareness that it is changing position," and (2) it must "show that there are good reasons for the new policy." *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 541 (Fed. Cir. 2019) (quoting *Fox*, 556 U.S. at 515). Where a changed position "rests upon factual findings that contradict those which underlay" the earlier position, the agency should also provide a "reasoned explanation" for such contradiction. *Fox*, 556 U.S. at 515–16. Commerce satisfied each requirement here.

It expressly acknowledged a change in position on the countervailability of Dongbu's first three debt-to-equity conversions, identified "good reasons" for the change, and issued a "reasoned explanation" as to why its prior factual determinations had been wrong. In twice remanding Commerce's change in position, the CIT erred.

In its first remand order, the CIT concluded—based on language in Commerce's questionnaire instructions—that Commerce has a standard practice of "not reexamining the countervailability of Plaintiffs' equity infusions absent new information," and therefore must identify such new information here. Appx10–11. That holding was erroneous. Even assuming a questionnaire could establish an agency practice, such practices can also be amended or deviated from through the process above. *See, e.g.*, *Am. Trucking Ass'ns v. Atchison, Topeka & Santa Fe Railway Co.*, 387 U.S. 397 (1967); *Riffin v. Surface Transp. Bd.*, 733 F.3d 340, 344–45 (D.C. Cir. 2013). But, in any event, Commerce identified ample new information warranting reexamination, including (1) the compounding effect of a fourth debt-to-equity conversion despite no improvement to Dongbu's financial health in prior rounds of the restructuring; (2) a new report issued during the period of review, confirming that Dongbu had failed to achieve virtually every financial target established at the outset of the restructuring; and (3) the first-time participation of an independent investor who <u>refused</u> to invest in Dongbu absent significant

additional concessions. Thus, even under the CIT's heightened standard, Commerce satisfied its obligations.

In its second remand order, the CIT imposed an even further heightened standard for agency reevaluation without justification. Specifically, the CIT held that "Commerce <u>may not</u> attempt to reverse the countervailability determinations on the first three administrative reviews in this case <u>absent new information to address fraud or mistake of fact</u>." Appx44. Because that holding contradicts controlling law, and amounts to an improperly limited remand, the CIT's second remand order is independently reversible.

### 1. Commerce's Final Results Easily Satisfied the Standard for a Change in Agency Position.

"{I}t is axiomatic that agency action must either be consistent with prior action or offer a reasoned basis for its departure from precedent. Yet it is equally axiomatic that an agency is free to change its mind so long as it supplies a reasoned analysis, showing that prior policies and standards are being deliberately changed, not casually ignored." *Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 667 (D.C. Cir. 2009). In *FCC v. Fox Television Stations*, the Supreme Court identified two requirements for an administrative agency to lawfully change its mind: (1) the agency must "display awareness that it <u>is</u> changing position," and (2) "the agency must show that there are good reasons for the new policy"—although "it need not demonstrate to a court's satisfaction that the reasons for the new policy are <u>better</u>

than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency <u>believes</u> it to be better, which the conscious change of course adequately indicates." 556 U.S. at 514–15 (emphases in original). When the new policy "rests upon factual findings that contradict those which underlay {the} prior policy," the agency's "good reasons" should explain the basis for the contradiction. *Id.* at 515–16.

When deviating from a past finding or practice, therefore, "Commerce need only show that its methodology is permissible under the statute and that it had good reasons for the new methodology." *Huvis Corp. v. United States*, 570 F.3d 1347, 1353 (Fed. Cir. 2009); *accord Mid Continent Steel*, 941 F.3d at 541 ("Even if the single action by Commerce is viewed as a new agency position, Commerce fulfilled the general agency obligation to display awareness that it is changing position and show that there are good reasons for the new policy. Commerce acknowledged the difference in treatment and gave a good reason{.}"); *Arkema Inc. v. EPA*, 618 F.3d 1, 6 (D.C. Cir. 2010) ("Of course, the Agency is entitled to change its mind as long as its new direction falls within the ambit of its authorizing statute and the policy shift is adequately explained. But while an agency must show good reasons for its new policy, there is no requirement that the policy change be justified by reasons more substantial than those the agency relied on to adopt the policy in the first place.").

Commerce's reevaluation of the first three debt-to-equity conversions more than satisfied these requirements. On July 12, 2021, Commerce issued a 21-page Preliminary Analysis Memorandum dedicated entirely to the subject of Dongbu's debt-to-equity conversions. *See* Appx8538–8558. The memo detailed Dongbu's (i) deteriorating financial condition over time, (ii) a series of bridge loans provided by the state-owned Korea Development Bank in an attempt to "shore up {Dongbu's} its financial position," (iii) an initial KDB-led bond refinancing agreement, all of which failed to prevent Dongbu from becoming [ *condition* ], and finally (iv) the corporate restructuring program involving a series of loan restructurings and debt-to-equity conversions continuing through this period of review. Appx8538–8545. The memorandum explained, "{a}fter careful consideration of the record of this review and for the reasons described below, we preliminarily find that while private investors participated in the debt-to-equity conversions in the 1st, 2nd, and 3rd equity infusions, we cannot rely on the prices paid by the private creditors and private investors for purpose of determining a benchmark." Appx8547.

Commerce's concurrent Preliminary Decision Memorandum acknowledged this was a change in position, *i.e.*, that in "previous reviews … we determined that KG Dongbu Steel did not receive a benefit" from the first three debt-to-equity conversions. Appx8512. "After further analysis of the facts on the record of this

immediate review," however, Commerce explained that the circumstances of the final round of restructuring led it to reconsider its earlier findings and determine that:

(1) "First, the private creditors {on Dongbu's creditors' committee} did not evaluate the reasonableness of the rate of return on any equity they were considering investing in the company in the first, second and third equity infusions. Rather, they were considering how best to limit their losses and maximize the debt recovery."

(2) "Second, the record demonstrates that the {government}-controlled creditors had control of the decision making within the {creditors' committee}."

(3) "Third, the KDB exercised considerable control over the {entire} debt restructuring."

*Id.*; *see also* Appx8513–8514 ("KG Dongbu Steel's creditors were interested in how best to maximize KG Dongbu Steel's value in order to recover debt financing investments. … This is inconsistent with the usual investment practice of private investors, which is to evaluate the potential risk versus the expected return.") ("{T}he PWC reports provide no indication that new equity shareholders could expect any return on investment.") ("KG Dongbu Steel's current and past indicators of financial health show that KG Dongbu Steel was unequityworthy at the time of the first, second, and third debt-to-equity conversions.") ("KG Dongbu Steel failed to make a profit from 2012 through 2018. Thus, KG Dongbu Steel had no returns in the three years prior to any of the three debt-to-equity conversions.").[5]

---

[5] The substantial evidence supporting Commerce's benefit determination is discussed in greater detail in Section VIII.C below.

Commerce's Final Results "continue{d} to find that the equity infusion program provided a financial contribution to KG Dongbu," applying the same methodology used in the Preliminary Results. Appx8772. Acknowledging again that this reflected a change in position, Commerce explained that "in the instant review, unlike in the prior reviews, there were private investors independent from the creditors committee involved in the fourth equity infusion"—"a factual change from prior reviews that led us to reconsider the role KDB played in its control of the creditors' committee." Appx8773.

As the Preliminary Analysis Memorandum explained, the only independent investor involved in any aspect of the relief program was the KG Consortium, which conditioned its ultimate investment on the steep prerequisites that occurred in the fourth and final round of Dongbu's debt restructuring. After engaging Ernst & Young to perform financial due diligence and a feasibility study, the KG Consortium concluded that Dongbu would only be a viable investment if (i) an additional ₩605 billion (more than $400,000,000) were removed from Dongbu's balance sheets via debt-to-equity conversion, and (ii) maturities and interest rates on Dongbu's remaining debts were extended and reduced. Appx8545. Dongbu's creditors committee also hired auditors to prepare financial analyses prior to each stage of the restructuring program. The final analysis issued in connection with the fourth round of restructuring described Dongbu's systematic failure "to achieve plan milestones"

and concluded that "new equity shareholders could {not} expect any return on investment." Appx8552–8553. Unlike the independent investor, however, Dongbu's government-led creditors committee continued to invest without similar constraints.

Taking into consideration the independent investor's demands, and further analyzing the government's role in each prior transaction, Commerce concluded that "{government}-controlled {financial institution creditors} controlled the decisions of the creditors' councils." Appx8546. That is, government banks "controlled a majority" of Dongbu's shares and a [ *percent* ] of the creditors committees' [ *authority* ], as a result of which "the private creditors had no decision-making control over the creditors' committees and no choice but to comply with the terms set by the KDB and other {government}-owned banks." *Id.*; Appx8773–8774. Moreover, Commerce noted its determinations in prior reviews that the same government banks controlled the loan side of Dongbu's restructuring program, a finding now affirmed by the CIT. Appx8773–8774 (citing *Nucor Corp. v. United States*, 494 F. Supp. 3d 1377 (Ct. Int'l Trade 2021)). "Because the same creditors councils simultaneously approved the restructurings of loans and the debt-to-equity conversions for Dongbu Steel, it would be unreasonable for us to find that the KDB exercised significant influence over the loans, but not the debt-to-equity conversions." *Id.*

Commerce's Final Results, which expressly incorporated its Preliminary Analysis Memorandum, thus more than adequately satisfied the standard for reevaluating a prior agency position, including one based on contrary findings of fact. *See Fox*, 556 U.S. at 514–16.

## 2. The CIT's First Remand Order Was Contrary to Law.

On appeal, the CIT did not review Commerce's Final Results for compliance with *Fox*, *i.e.*, did not ask whether Commerce had acknowledged its change in position and offered good reasons for the same. Instead, the CIT held (1) that Commerce must cite "new evidence" before re-examining the first three debt-to-equity conversions and (2) such evidence must relate directly to those transactions. In other words, the CIT essentially prohibited Commerce from making its own factual conclusion that the circumstances surrounding the final debt-to-equity conversion might be relevant to the first three conversions. Those holdings were contrary to law.

Commerce's standard countervailing duty questionnaire states, "{a}bsent new information warranting a program reexamination, we will not reevaluate prior determinations regarding the countervailability of programs." Appx10. Based on that language, the CIT "conclude{d} that Commerce has a standard practice of not reexamining the countervailability of Plaintiffs' equity infusions absent new information," such that a reasoned explanation for a changed benefit determination

must identify such new information here. Appx11; *see also* Appx11 ("Commerce has neither provided a sufficient explanation nor cited new information on the record that relates to whether the first three debt-to-equity restructurings provided a countervailable benefit."); Appx12–13 (holding that, because Commerce did not "cit{e} new evidence about the first through third debt-to-equity restructurings," "Commerce failed to provide an adequate explanation for its decision to deviate from its prior determinations").

As discussed above, Commerce <u>did</u> identify new information regarding the countervailability of the debt restructuring program, including the first-time participation of an independent investor—not controlled by government banks—that refused to invest in Dongbu even after three rounds of significant debt relief, Appx8773; Appx8545, and the latest in a series of financial reports confirming Dongbu's failure to meet financial targets up to that point, Appx8552–8553.

But the CIT rejected that evidence as "not a sufficient explanation to justify departing from {Commerce's} standard practice." Appx12. In the court's view, "new information" that would justify a re-evaluation of Commerce's earlier benefit determinations must "deal <u>directly</u> with the first through third debt-to-equity restructurings"—as opposed to being "evidence based on the fourth debt-to-equity restructuring" that placed those earlier transactions in a different light. Appx11–12. Accordingly, the Court remanded for Commerce to identify "new evidence about the

first through third debt-to-equity restructurings that came to light after Commerce had made {its} prior determinations{.}" Appx13.

For a number of reasons, the CIT's remand order was erroneous. First, the Court was wrong as a factual matter. Commerce did point to new evidence that related directly to the first three debt-to-equity conversions. Commerce emphasized that Dongbu "repeatedly failed to meet its required performance goals set in the restructuring agreements and required multiple restructurings of the loans as well as debt-to-equity conversions." Appx8549. This conclusion was supported by a report prepared during the fourth and final debt restructuring, which was not on the record of prior reviews and provided a backwards-looking assessment of Dongbu's performance throughout the debt restructuring process. *See* Appx2891.

Second, the CIT unduly limited Commerce's authority to reconsider prior determinations. While an administrative agency <u>may</u> reconsider a prior position based on new information, it may also do so "in light of experience" or "further analysis or other factors indicating that the agency's earlier decision should be altered or abandoned." *New England Power Generators Ass'n, Inc. v. FERC*, 879 F.3d 1192, 1201 (D.C. Cir. 2018). New evidence is specifically not required. *See Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1037 (D.C. Cir. 2012) ("<u>*Fox* likewise dispenses with the petitioners' complaint that the Amended {} Rule merely revisits old evidence and arguments, rather than adduces new data or experience.</u>");

*Nat'l Res. Def. Council v. Nat'l Marine Fisheries Serv.*, 71 F. Supp. 3d 35, 58 (D.D.C. 2014) ("An agency's change in position need not be based on new data or experience, so long as the agency displays awareness that it is changing position, and provides a reasoned explanation{.}").

While Commerce's boilerplate questionnaire instructions may refer to new evidence, its actual determinations consistently refer to reevaluation based on "new argument or record evidence." *See, e.g.*, Issues and Decision Memorandum Accompanying *Certain Aluminum Foil from the People's Republic of China*, 86 Fed. Reg. 12,171 (Dep't Commerce Mar. 2, 2021) at 16 ("In the absence of new argument or record evidence, we find no cause to reevaluate this issue for these final results."); Issues and Decision Memorandum accompanying *Certain Softwood Lumber Products from Canada*, 89 Fed. Reg. 67,062 (Dep't Commerce Aug. 19, 2024) at 157 ("{T}here are no new arguments or evidence … in this review that would lead Commerce to revise its finding from the previous review ….").

Commerce has thus never represented itself as limited to reconsidering previous determinations only in the face of new evidence. Per agency practice as articulated in its authoritative determinations, additional legal justification is also sufficient. It should come as no surprise that Commerce's questionnaire instructions differ from its determinations in this respect. Questionnaires are designed to solicit evidence, not argument, while the agency's determinations articulate both factual

and legal bases for its decisions in light of both the record evidence and the arguments presented in the case and rebuttal briefs of interested parties.

The CIT also erred in dictating the kind of new evidence that Commerce may accept. Nothing in Commerce's standard questionnaire limits the type of "new information warranting a program reexamination" that Commerce may take into account. *See* Appx10. Here, Commerce reasonably explained that new information regarding an independent investor's participation in the fourth debt-to-equity restructuring called into question the independence of private investors in the earlier transactions. *See* Appx8773. Commerce further explained that a closer look at those transactions revealed total domination of the creditors committee by government-controlled banks. *See id.* Moreover, Commerce explained that it had determined in prior reviews that the loan side of Dongbu's debt restructuring program was government-controlled and countervailable, which the CIT affirmed. *See* Appx8773–8774. Upon further reflection, Commerce determined it would be "unreasonable for us to find that the KDB exercised significant influence over the loans, but not the debt-to-equity conversions." *Id.*

Each of these considerations constitutes "new information warranting a program reexamination." *See* Appx145. And each demonstrates that, "faced with new developments or in light of reconsideration of the relevant facts and its mandate," Commerce reasonably re-evaluated its prior benefit determinations fully

consistent with controlling law. *See Am. Trucking*, 387 U.S. at 416. That the CIT would have preferred different information, or would have reached a different conclusion than Commerce about the relevance of existing information, is not the applicable standard for appellate review. The court's remand order should be reversed and Commerce's determination reinstated.

### 3. The CIT's Second Remand Order Was Contrary to Law and Imposed an Improperly Limited Remand.

The CIT's second remand order was likewise erroneous. On remand, Commerce elaborated on the factual bases for its reconsideration of the first three debt-to-equity conversions and added explicitly that its prior benefit determinations resulted from a "mistake" of law as well. Appx9044 ("{W}e realized that our prior finding that no benefit was conferred by the first three debt-to-equity restructuring was inconsistent with 19 CFR 351.507."). And Commerce restated the record information, including the new information, that supported its changed position. *See id.* ("{T}he record in the instant review, unlike that in the prior reviews, indicates there were private investors independent from the creditors' committee involved in the fourth equity infusion{.}"); Appx9045 ("{A}ll of the creditor banks, including the private banks, were obligated to participate in the debt restructuring, which provided the {government}-owned and controlled banks with the ability to establish the financial terms of the debt restructuring{.}"); *id.* ("{I}t would be inconsistent for Commerce to find on the one hand that the {government}-controlled policy banks

have significant influence over the loan portion of the debt restructuring, and on the other hand that the same banks did not have such influence over the debt-to-equity portion{.}"); Appx9046 ("Private creditors on the creditors councils did not evaluate the reasonableness of the rate of return on any equity they were considering investing in the company in each debt-to-equity conversion. Rather, they were considering how best to limit their losses.").

Commerce's remand redetermination plainly displayed "awareness" of the agency's change in position and provided a "reasonable explanation" based in both law and fact for that change. *See Fox*, 556 U.S. at 515–16. But the CIT reversed again. Relying again on the language in Commerce's standard questionnaire instructions, the CIT concluded that the "<u>only</u> reason for Commerce to re-examine the countervailability of the prior debt-to-equity restructurings is new information," and that Commerce had cited no such information in its remand redetermination. Appx35–36. ("Commerce on remand points to no new information on the record that it has not already considered in its prior final determinations that there were no countervailable benefits in KG Dongbu's first three debt-to-equity restructurings."). On that basis, the Court held that Commerce arbitrarily treated similar situations differently. Appx36; *see also* Appx43 ("{I}t is arbitrary for Commerce to revisit and attempt to reverse the determinations in those completed administrative reviews retroactively without citing new evidence.").

Apparently misunderstanding the scope of Commerce's determination in this administrative review, the CIT directed that "Commerce <u>may not</u> attempt to reverse the countervailability determinations on the first three administrative reviews in this case absent new information <u>to address fraud or mistake of fact</u>." Appx44. As explained above, Commerce did not retroactively modify, let alone "reverse," the outcome of any "completed administrative reviews."[6] Regardless, the Court unduly circumscribed Commerce's discretion.

Because the CIT's second remand order (1) continued to misstate the law, *see Nat'l Ass'n of Home Builders*, 682 F.3d at 1037 and *Nat'l Res. Def. Council*, 71 F. Supp. 3d at 58 (confirming *Fox* forecloses an argument that agency reconsideration must rest on new facts); (2) erroneously concluded that Commerce failed to cite new information on remand; and (3) imposed an improperly limited remand that foreclosed Commerce's independent exercise of judgment, *see Changzhou Wujin v. United States*, 701 F.3d 1367, 1374–75 (Fed. Cir. 2012) and *Am. Silicon Techs.*, 334 F.3d at 1038 (disapproving of limited remand orders), it was contrary to law. Indeed, on remand, Commerce had no choice but to reverse its benefit determination under protest—having no "other basis in the record to conclude that a benefit was

---

[6] The results of previous administrative reviews of this countervailing duty order are final, and any duties assessed on entries during the respective periods of review have not been, and will not be, modified by the results of this or any subsequent review.

conferred" under the CIT's limited remand instructions.  Appx25.  The CIT's second remand order thus was reversible on multiple grounds and resulted in a final remand redetermination and CIT affirmance on improperly restricted terms.

## C.    Commerce's Benefit Determination Was Supported by Substantial Evidence

In addition to holding that Commerce's benefit determination as to the first three debt-to-equity conversions was arbitrary and contrary to law, the CIT ultimately held that it was not supported by substantial evidence.  That holding was likewise erroneous and should be reversed.

Commerce explained in detail, in its Preliminary Analysis Memorandum and Final Results, why the participation of private investors in the first three debt-to-equity conversions was not "significant," such that Commerce could not use their investments to determine whether a benefit had been conferred.  *See, e.g.*, Appx8547–8548; Appx8772–8776; *see also* 19 C.F.R. § 351.507(a).  Commerce explained that government-controlled banks dominated Dongbu's debt restructuring process, in addition to holding a [ *percent* ] of the creditors committees' [ *authority* ].  Appx8547–8548; Appx8773.  As a result, the committees' private investors "had no alternative but to accept the terms imposed by the KDB and other {government}-owned policy banks."  Appx8549; Appx8773.  Commerce explained that similar circumstances had led the agency to countervail debt restructuring programs in the past, Appx8776, including the loan component of Dongbu's debt

restructuring program here—a decision affirmed by the CIT, Appx8773 (citing *Nucor*, 494 F. Supp. 3d at 1381). Commerce's findings thus were amply supported by substantial evidence.

The CIT did not reach the question of the substantial evidence underlying Commerce's benefit determination. Instead, it summarily remanded the issue in its first opinion, *see* Appx17, and focused exclusively on the evidence supporting Commerce's change of position in the second, *see* Appx36 ("Commerce's determination is not supported by substantial evidence because it does not satisfy the standard in *SKF USA* (requiring Commerce to provide a reasonable explanation for treating similar situations differently).").

This Court should affirm Commerce's benefit determination as supported by substantial evidence. Regardless of whether the CIT reached a particular issue, this Court may affirm an agency determination on any grounds supported by the record. *Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1365–66 (Fed. Cir. 2020) ("Although the district court did not reach this issue, we may affirm on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court."). Moreover, the Court replicates the CIT's review in any event. *See Sunpreme*, 946 F.3d at 1308 (explaining the Court reviews antidumping determinations "anew," repeating "much of the work of the

CIT"). And for the reasons discussed further below, Commerce's determination was amply supported by record evidence.

### 1. Commerce's Benefit Determination Was Supported by Substantial Evidence

As noted above, Commerce will not rely on private investor prices for the calculation of a benefit through an equity infusion if the private investor purchases of newly issued shares are not "significant." 19 C.F.R. § 351.507(a)(2)(iii). Here, after thorough analysis of the record facts, Commerce determined that the private investor prices for the first, second, and third debt-to-equity conversions were not significant and thus were not usable to calculate the benefit conferred by those transactions. Record evidence supported Commerce's conclusions.

Specifically, Commerce found, and record evidence amply demonstrated, that government-controlled entities, and KDB in particular, exercised significant influence over Dongbu's first three debt-to-equity conversions, depriving the private members of Dongbu's creditors committee of decision-making control. *See* Appx8773 (citing Appx8548); *see also* Appx1850, Appx1878–1892; Appx4179–4193, Appx4294.

At the time of the first debt-to-equity conversion, government-owned banks, including KDB, owned [   #   ] percent of Dongbu's shares, and [

*percent of authority*                                                    ]. *See* Appx8543–8544;

Appx2331; Appx4358–4395. During the second conversion, [   *institutions held a*

41

*percentage* ] of Dongbu's shares subject to conversion and [ *held percent of authority* ]. *See* Appx8543–8544; Appx489, Appx2691. At the third conversion, [ *institutions held percent of authority* ]. *See* Appx8544; Appx490. Korean government financial institutions thus held [ *percent* ] of creditor committee [ *authority* ] throughout the process, depriving non-government banks of the ability to exert genuine influence over the relevant transactions' terms.

In addition to government financial institutions holding a majority of the shares and [ *percent of authority* ], KDB in fact exercised significant influence over the relevant transactions. *See* Appx8548. KDB and Dongbu entered into a [ *business relationship* ], which allowed KDB to dictate how Dongbu would use its assets and production to generate revenue and how Dongbu would repay its creditors. Appx8539, Appx8548; *see also* Appx8774; Appx459–461, Appx493, Appx1763, Appx1850; Appx4179–4193, Appx4294. That [ *relationship* ], coupled with the government-controlled banks' [ *percent of authority* ] on the creditors committee, meant that private creditors on the committee had no alternative but to accept the terms imposed on them by the government banks or accept immediate losses on their debt holdings, again on terms dictated by the government financial institutions. *See* Appx8773; Appx8548; Appx 4179–4193, Appx4294; Appx1878–1892.

Accordingly, although private investors on Dongbu's creditors committees did participate in the first three debt-to-equity restructurings, given the level of government influence and control over the committees, Commerce reasonably determined their participation was not significant. Appx8773; Appx8546–8548. Thus, pursuant to 19 C.F.R. § 351.507(a), Commerce proceeded to determine whether Dongbu was equityworthy at the time of those transactions—which Commerce answered in the negative, Appx8776–8777, and which Dongbu did not challenge on appeal. Both agency and judicial precedents support Commerce's determination.

In very similar circumstances, *i.e.*, where government-owned banks dominated creditors committees in government-led restructurings, Commerce has determined that the equity purchases of private investors on those committees were not significant. In *Refrigerator-Freezers from Korea*, for example, Commerce considered the participation of private investors in a debt-to-equity conversion facilitated by a similar creditors committee in which government institutions held a veto-proof majority of voting rights. *See Refrigerator-Freezers from Korea* IDM at 100. [*comparison*], Commerce noted that the entity under review "was placed into a government-led restructuring program" wherein "the GOK held a supermajority of at least 75 percent in {the entity's} Creditors' Council at the time the final terms of the {relevant} debt-to-equity conversions were approved{.}" *Id.* Because the

"GOK controlled the decisions of the Creditors' Council, and was therefore able to impose its decisions on the private creditors," Commerce determined "private investor participation {wa}s not significant." *Id.*

Importantly, Commerce has also determined in prior reviews of this Order that the Korean government's domination over Dongbu's creditors committees rendered the loan terms of participating non-government banks unsuitable as interest rate benchmarks for any new loans, and the CIT affirmed this determination. *See Nucor*, 494 F. Supp. 3d 1377 (affirming results of 2015 administrative review). As explained above, Dongbu's corporate restructuring program had both loan and debt-to-equity conversion components, overseen by Dongbu's creditors committees. In assessing the countervailability of the loan component in an earlier review, Commerce observed "substantial government influence" over Dongbu's debt restructuring program and "Dongbu's debt restructuring agreement that was significantly influenced by the state-owned Korea Development Bank." *Id.* at 1381. Consequently, Commerce determined that "Dongbu's loans from private creditors on the debt restructuring committee could not be used as a benchmark for measuring benefits from government loans." *Id.* at 1380. The CIT agreed, finding it "reasonable for Commerce to determine that Dongbu's loans were non-commercial and provided under a government program based on record evidence demonstrating

the significant influence of the state-owned Korea Development Bank in Dongbu's restructuring." *Id.* at 1381.

Because Commerce's benefit determination was both amply supported by substantial evidence in the abstract, and also in conformity with directly on-point agency and judicial precedents, it should be affirmed.

## 2. The CIT Did Not Reach the Substantiality of the Evidence Underlying Commerce's Benefit Determination

The CIT did not reach the substantiality of the evidence supporting Commerce's benefit determination. Its first remand order, the CIT dispensed with the issue in a single sentence and summarily reversed: "Because the Court is remanding Commerce's determination as not in accordance with the law, the Court also remands the issue for consideration of whether Commerce's determination is supported by substantial evidence." Appx13.

In its second remand order, the CIT discussed substantial evidence at greater length, but focused exclusively on the perceived lack of evidence supporting Commerce's changed position. *See* Appx36 ("Commerce's determination is not supported by substantial evidence because it does not satisfy the standard in *SKF USA* (requiring Commerce to provide a reasonable explanation for treating similar situations differently)."); Appx41, ("Commerce did not need to revisit its prior determinations…."); Appx43, ("Substantial evidence does not support Commerce's remand determination that private investor participation in the first three debt-to-

equity restructurings was not significant.  <u>Based on the same record evidence,</u> <u>Commerce determined in the prior administrative reviews that the private creditors</u> <u>in the debt-to-equity swaps were significant</u>.").

If the Court reaches the CIT's second remand order on substantial evidence, it should be reversed.[7]  To begin with, the CIT conflated separate issues. Commerce's benefit determination presented a threshold question of whether Commerce had articulated sufficiently "good reasons" to reconsider previous debt-to-equity conversions and change its mind—with the repeated caveat that such reasons need not have been more compelling than the original reasons provided. *Fox*, 556 U.S. at 515.  Separate and apart from that question is whether a "reasonable mind" could conclude that the first three debt-to-equity conversions provided a benefit as Commerce found—*i.e.*, whether the benefit determination was itself supported by substantial evidence.  *See, e.g.*, *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1335 (Fed. Cir. 2002).  The CIT's substantial evidence review was limited primarily to the former issue.

---

[7]     In appeals from CIT proceedings involving multiple remands, this Court begins with Commerce's original determination and advances sequentially.  Thus, if the Court finds that Commerce's original determination or first remand redetermination is lawful and supported by substantial evidence, it should affirm that determination without needing to reach the CIT's second remand order in its review. *See, e.g.*, *Worldwide Door Components, Inc. v. United States*, 119 F.4th 959, 969 (Fed. Cir. 2024) (affirming Commerce's first remand redetermination and vacating CIT's "subsequent opinions and orders").

With regard to the substantial evidence analysis that the CIT did perform, the court overstepped its role in substantial evidence review. As this Court knows, the "highly deferential {substantial evidence} standard recognizes Commerce's expertise in antidumping duty investigations." *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*, 5 F.4th 1367, 1374 (Fed. Cir. 2021). Indeed, the Court reviews Commerce's factual determinations for substantial evidence precisely because such determinations are "best left to the agency's expertise." *Id.* Thus, it is well-understood that substantial evidence review is a "limited standard of review" that does not permit a reviewing court to "substitute {its} judgment for that of Commerce." *Inland Steel Indus., Inc. v. United States*, 188 F.3d 1349, 1359 (Fed. Cir. 1999). Put differently, "{t}hat the trial court may be able to point to certain record evidence that is less persuasive or could support a contrary finding does not make the agency's decision unsupported by substantial evidence." *Worldwide Door*, 119 F.4th at 969.

Consistent with this guidance, the CIT's belief that Commerce's reasons for reevaluating its position were "unpersuasive" or not "convinc{ing}" is not the standard for substantial evidence review. *See* Appx40–42 ("The Court is not convinced that Commerce's prior determinations of no countervailable benefits … were 'mistakes.'") ("Commerce's attempt to rely on the existence of the fourth debt-to-equity restructuring as the basis for why it had to reconsider the benefit element

of the first three debt-to-equity restructurings is unpersuasive."). As discussed above, Commerce cited ample record evidence in support of its determination that private investor participation in the first three debt-to-equity conversions was not significant. And both agency and CIT precedents confirm that precisely such evidence constitutes adequate support. The CIT's holding to the contrary must therefore be reversed.

### D. Commerce's Pass-Through Determination Was Supported by Substantial Evidence

Commerce also reasonably determined that the benefits from Dongbu's debt-to-equity conversions were not extinguished as a result of the KG Consortium's investment in Dongbu Steel. At the outset of this proceeding, Commerce notified Dongbu that non-recurring subsidies, which include "equity infusions" specifically, are presumed to benefit a recipient over their AUL. Appx8781. Commerce also gave Dongbu the opportunity to rebut that presumption with evidence that a relevant change in ownership extinguished such benefits, by responding to Commerce's Change in Ownership Appendix. *Id.*

Dongbu declined to respond to the Appendix, stating it "had not been privatized, changed ownership, merged with another company, or devolved another company/companies from its corporate structure in whole or in part, during the AUL period" and "does not wish to challenge the Department's baseline presumption …." *Id.* Accordingly, Commerce applied its presumption and determined that the

benefits of the first three debt-to-equity conversions continued to benefit Dongbu in the underlying period of review.

Dongbu argued, and the CIT agreed, that Commerce's reevaluation of the first three debt-to-equity conversions was unforeseen and thus excused Dongbu's failure to respond to the Change in Ownership Appendix. *See* Appx46. But Commerce specifically stated in earlier reviews that it could reexamine its benefit determination on the debt-to-equity conversion issue, *see id.*, which Dongbu thus knew was a possibility and is precisely what happened here.

In any event, Commerce's determination was supported by substantial evidence. In addition to the evidence discussed above demonstrating that Dongbu's creditors committee did not act "in a manner consistent with the normal sales practices of private, commercial sellers," *Notice of Final Modification*, 68 Fed. Reg. at 37,127, Commerce observed that the committee paid more per share than Dongbu's independent buyer, Appx8783—a "primary consideration" in a pass-through determination, *Notice of Final Modification*, 68 Fed. Reg. at 37,127. Thus, consistent with its presumption, applicable regulations, and record evidence in the underlying review, Commerce's pass-through determination should be affirmed.

### 1. Commerce's Pass-Through Determination Was Supported by Substantial Evidence

In the underlying review, Commerce gave Dongbu the option to challenge its baseline presumption that non-recurring subsidies pass through after a change in ownership by submitting a Change-in-Ownership Appendix, stating:

> Commerce allocates the benefits received from certain types of subsidies over time (*e.g.*, equity infusions, non-recurring grants, debt forgiveness, import duty or value-added tax exemptions or reductions on capital equipment, *etc.*)….

> Thus, in addition to investigating alleged subsidies that your company may have received during the POI, Commerce is also investigating alleged allocable, nonrecurring subsidies that your company may have received during the AUL period. Because of this… if your company has been privatized, changed ownership, merged with another company, or devolved another company/ies from your company's corporate structure in whole or in part, during the AUL period and your company wishes to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, please coordinate with your government to answer the questions in the Change-in-Ownership Appendix. If your company does not wish to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, please so state and you do not need to provide a response to the Change-in-Ownership Appendix.

Appx8781; Appx223.

Dongbu did not respond to the Change-in-Ownership Appendix and specifically stated "Dongbu does not wish to challenge the Department's baseline presumption and thus understands that no response to the Change-in-Ownership Appendix is required." Appx8779–8780. Because respondents bear the burden of challenging the baseline presumption that non-recurring subsidies continue to

benefit the recipient after an acquisition, Commerce did not analyze whether any acquisition of Dongbu extinguished the first three debt-to-equity conversions. *Id.*

Below, Dongbu argued that it did not respond to the Change-in-Ownership Appendix because it relied on Commerce's prior determination that the debt-to-equity conversions had conferred no countervailable benefit, meaning there were no non-recurring subsidies to pass through the acquisition. *See* Appx8778 (reciting Dongbu arguments); Appx8871–8873. As such, Dongbu asserted the presumption should not apply. Commerce reasonably explained why Dongbu's position is unavailing.

"{T}he debate over the countervailability of Dongbu Steel's equity infusions has been significant in all prior reviews," putting Dongbu squarely "on notice of the issue." *See* Appx8780. Indeed, in earlier reviews, Commerce stated explicitly that it might revisit its benefit determinations. *See* Appx8772 (quoting 2018 Issues & Decision Memorandum). Thus, "although KG Dongbu was aware that the petitioners have been arguing for Commerce to countervail the debt-to-equity infusions since the first administrative review of this proceeding and that an acquisition had occurred and, therefore, that non-recurring subsidy pass through could be an issue in this review," Dongbu specifically represented that it "does not wish to challenge the Department's baseline presumption." Appx8781.

Because Dongbu did not respond to the Change-in-Ownership Appendix, Commerce was neither obligated nor able to perform "a complete analysis as to whether prior subsidies were extinguished by the acquisition." Appx8782.[8] But Commerce nevertheless cited substantial record evidence that they were not extinguished. Specifically, Commerce observed that the "price per share paid by the Creditors Council was higher than the price per share paid by the {independent buyer}," demonstrating that the government-led creditors committee "likely did not maximize its return when selling Dongbu Steel" or act "in a manner consistent with the normal sales practices of private, commercial sellers in Korea." Appx8783; *cf. Notice of Final Modification*, 68 Fed. Reg. at 37,127 (noting a "primary consideration" is whether the "purchaser paid less for the company" than it would have had "the government acted in a manner consistent with the normal sales practices of private, commercial sellers"). Moreover, and as discussed above, a condition for the acquisition was that the creditors committee extend existing loans

---

[8]     As explained above, the change-in-ownership analysis for the purpose of extinguishment of subsidy benefits is a complex, fact-intensive exercise that requires detailed information, in coordination with the foreign government, in response to specific questions that Commerce has determined must be answered to facilitate an adequate review. *See, e.g.*, Appx8780. It is well established that Commerce, and not an interested party, determines what information is necessary and how should it be provided. *See, e.g.*, *NSK Ltd. v. United States*, 919 F. Supp. 442, 447 (Ct. Int'l Trade 1996) (holding respondent's "assertion that the information it submitted to Commerce provided a sufficient representation … misses the point that it is Commerce, not the respondent, that determines what information is to be provided for an administrative review").

and reduce interest rates, in addition to agreeing to another round of debt-to-equity conversions—for which the price per share paid by the creditors' committee was higher than the price paid by the KG Consortium. Appx8782–8783. These concessions further demonstrate that the government-led creditors committee "failed to maximize its return on what it sold." *Notice of Final Modification*, 68 Fed. Reg. at 37,127.

### 2. The CIT Did Not Reach the Substantiality of the Evidence Underlying Commerce's Pass-Through Determination

In its first remand order, the CIT summarily remanded Commerce's pass-through determination alongside its determination that the first three debt-to-equity conversions provided a benefit. Appx14–15 ("On remand, Commerce may reconsider the record with respect to whether KG Dongbu received any countervailable subsidies; therefore, the Court also remands this issue for Commerce to reconsider whether substantial evidence supports a determination that any change in ownership occurred at arm's length and for fair market value{.}").

In its second remand order, the CIT recited each of <u>Dongbu</u>'s arguments on appeal, without addressing the substantiality of the evidence cited by Commerce in support of its own determination. *See* Appx45 ("KG Dongbu contends…"), Appx46 ("Second, KG Dongbu argues…"), Appx48–50 ("KG Dongbu claims…"; "Second, KG Dongbu claims…"; "Third, KG Dongbu also claims…"; "Fourth, KG Dongbu

argues…"). The CIT remanded for Commerce to address Dongbu's appellate arguments. Appx50.

To the extent the Court reaches the CIT's second remand order (*see* n.7 above), it should be reversed. The question before the CIT was whether a reasonable mind might accept Commerce's cited evidence as "adequate to support {its} conclusion." *Ta Chen*, 298 F.3d at 1335. As discussed above, it is undisputed that Dongbu elected not to challenge the presumption that non-recurring subsidies continue to benefit a respondent during the period of their AUL. Appx8780–8781. It is undisputed that Commerce therefore lacked the evidence it normally requires to make an extinguishment determination—and that the presumption therefore stands. *Cf. Hyundai Heavy Indus., Co. v. United States*, 332 F. Supp. 3d 1331, 1342 (Ct. Int'l Trade 2018) ("The burden to build the record in each segment lies with the respondent."). And it is undisputed that the government-led creditors committee offered considerable concessions in the course of the acquisition and paid more per share than Dongbu's independent, private buyer, tipping a "primary consideration" in support of Commerce's pass-through determination in any event. *See Notice of Final Modification*, 68 Fed. Reg. at 37,127.

That Dongbu made arguments to the contrary does not negate the substantiality of the undisputed evidence above. *See Worldwide Door*, 119 F.4th at 969 ("That the trial court may be able to point to certain record evidence that is less

persuasive or could support a contrary finding does not make the agency's decision unsupported by substantial evidence."). Nor does the CIT's continued belief that Commerce had no basis to change position on the underlying benefit determination. *See* Appx46 ("The Court agrees with KG Dongbu's argument that KG Dongbu had no reason to submit the CIO Appendix to challenge Commerce's baseline presumption regarding non-recurring subsidies based on unforeseeable actions that Commerce would take in the future{.}").

The law is clear that prior benefit determinations are not set in stone and may be revisited in the face of new argument or evidence. Indeed, Commerce explicitly stated that it could revisit this very issue in its prior administrative review. *See* Appx8772. As such, Dongbu could not foreclose the possibility that Commerce would find new evidence or consider new arguments in this review. Accepting Dongbu's justification for withholding responses to the Change-in-Ownership Appendix improperly shifts responsibility for the results of an interested party's litigation choices onto Commerce. That Dongbu, or the CIT, would have decided differently with the benefit of hindsight does not impact the substantiality of the evidence underlying Commerce's pass-through determination.

## IX. **CONCLUSION**

For the foregoing reasons, Nucor respectfully requests that the Court reverse the CIT's remand orders and reinstate Commerce's original determinations.

Respectfully submitted,

/s/ Alan H. Price
Alan H. Price, Esq.
Christopher B. Weld, Esq.
Tessa V. Capeloto, Esq.
Adam M. Teslik, Esq.
Enbar Toledano, Esq.

**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
202-719-7000

*Counsel to Nucor Corporation*

Dated: April 7, 2025

# ADDENDUM

Slip Op. 23-98

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **KG DONGBU STEEL CO., LTD., DONGBU STEEL CO., LTD., AND DONGBU INCHEON STEEL CO., LTD.,** | |
| **Plaintiffs,** | |
| **v.** | **Before: Jennifer Choe-Groves, Judge** |
| **UNITED STATES,** | **Court No. 22-00047** |
| **Defendant,** | |
| **and** | |
| **NUCOR CORPORATION AND STEEL DYNAMICS, INC.,** | |
| **Defendant-Intervenors.** | |

## <u>OPINION AND ORDER</u>

[Remanding the final determination of the U.S. Department of Commerce in the countervailing duty review of certain corrosion-resistant steel products from the Republic of Korea.]

Dated: July 7, 2023

<u>Brady W. Mills</u>, <u>Donald B. Cameron</u>, <u>Julie C. Mendoza</u>, <u>R. Will Planert</u>, <u>Mary S. Hodgins</u>, <u>Eugene Degnan</u>, <u>Edward J. Thomas, III</u>, <u>Jordan L. Fleischer</u>, and <u>Nicholas C. Duffey</u>, Morris, Manning & Martin, LLP, of Washington, D.C., for Plaintiffs KG Dongbu Steel Co., Ltd., Dongbu Steel Co., Ltd., and Dongbu Incheon Steel Co., Ltd.

Claudia Burke, Assistant Director, Elizabeth Speck, Senior Trial Counsel,
Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of
Washington, D.C.  With them on the brief were Brian M. Boynton, Principal
Deputy Assistant Attorney General, and Patricia M. McCarthy, Director.  Of
Counsel on the brief was Ayat Mujais, Attorney, Office of the Chief Counsel for
Trade Enforcement & Compliance, U.S. Department of Commerce, of
Washington, D.C.

Alan H. Price, Christopher B. Weld, Tessa V. Capeloto, and Adam M. Teslik,
Wiley Rein LLP, of Washington, D.C., for Defendant-Intervenor Nucor
Corporation.

Jeffrey D. Gerrish, Roger B. Schagrin, and Saad Y. Chalchal, Schagrin Associates,
of Washington, D.C., for Defendant-Intervenor Steel Dynamics, Inc.

Choe-Groves, Judge: Plaintiffs KG Dongbu Steel Co., Ltd., Dongbu Steel

Co., Ltd., and Dongbu Incheon Steel Co., Ltd. (collectively, "KG Dongbu" or

"Plaintiffs") challenge the U.S. Department of Commerce's ("Commerce") Certain

Corrosion-Resistant Steel Products From the Republic of Korea: Final Results and

Partial Rescission of Countervailing Duty Administrative Review; 2019.  Compl.,

ECF No. 12; Certain Corrosion-Resistant Steel Products From the Republic of

Korea ("Final Results"), 87 Fed. Reg. 2759 (Dep't of Commerce Jan. 19, 2022)

(final results and partial rescission of countervailing duty administrative review;

2019); see also Issues and Decision Memorandum for the Final Results and Partial

Rescission of the 2019 Administrative Review of the Countervailing Duty Order

on Certain Corrosion-Resistant Steel Products from the Republic of Korea ("Final

IDM"), PR 213.[1]

KG Dongbu challenges: (1) Commerce's determination that the first through

third debt-to-equity restructurings provided a countervailable subsidy;

(2) Commerce's determination that the benefits from KG Dongbu's debt-to-equity

restructurings that Commerce first found countervailable in Certain Corrosion-

Resistant Steel Products From the Republic of Korea ("Preliminary Results"), 86

Fed. Reg. 37,740 (Dep't of Commerce July 16, 2021) (preliminary results of

countervailing duty administrative review, 2019) passed through to KG Dongbu

despite the change in ownership during the 2019 period of review; (3) Commerce's

calculation of the uncreditworthiness benchmark for purposes of measuring the

benefit from KG Dongbu's restructured long term loans and bonds; and

(4) Commerce's calculation of the unequityworthy discount rate for purposes of

measuring the benefits from the equity infusions from government-controlled

creditors.  Pls.' Mot. J. Agency R. and Mem. Supp. ("Pls.' Br."), ECF Nos. 33, 34;

Pls.' Reply Br. Supp. Mot. J. Agency R. ("Pls.' Reply Br."), ECF Nos. 40, 41.

Defendant United States ("Defendant") and Defendant-Intervenor Nucor

Corporation ("Nucor") argue that the Court should sustain the Final Results.

---

[1] Citations to the administrative record reflect the public administrative record
("PR") document numbers.  ECF No. 44.

Def.'s Resp. Br. Pl.'s Mot. J. Agency R. ("Def.'s Resp. Br."), ECF Nos. 35, 36;

Def.-Interv.'s Resp. Mot. J. Agency R. ("Def.-Interv.'s Resp. Br."), ECF Nos. 37,

38, 39.  For the reasons discussed below, the Court remands Commerce's <u>Final</u>

<u>Results</u>.

## ISSUES PRESENTED

The Court reviews the following issues:

1. Whether Commerce's determination that the first through third debt-to-equity restructurings provided a countervailable benefit to KG Dongbu is supported by substantial evidence and in accordance with the law;

2. Whether Commerce's determination that the benefits from the debt-to-equity restructurings passed through to KG Dongbu despite the change in ownership is supported by substantial evidence;

3. Whether Commerce's calculations of the uncreditworthy benchmark rate are supported by substantial evidence; and

4. Whether Commerce's calculations of the unequityworthy discount rate are supported by substantial evidence.

## PROCEDURAL HISTORY

Commerce published its countervailing duty order in the Federal Register.

<u>Certain Corrosion-Resistant Steel Products From India, Italy, Republic of Korea</u>

and the People's Republic of China, 81 Fed. Reg. 48,387 (Dep't of Commerce July

25, 2016) (countervailing duty order).  Commerce initiated an administrative

review of the countervailing duty order on certain corrosion-resistant steel products

from Korea for the period of January 1, 2019, to December 31, 2019, selecting KG

Dongbu and Hyundai Steel Company ("Hyundai Steel") as mandatory respondents.

Initiation of Antidumping and Countervailing Duty Administrative Reviews, 85

Fed. Reg. 54,983, 54,990–91 (Dep't of Commerce Sept. 3, 2020).

Commerce issued the Preliminary Results of the administrative review.

Preliminary Results, 86 Fed. Reg. 37,740; Decision Memorandum for the

Preliminary Results of the Countervailing Duty Administrative Review; 2019:

Certain Corrosion-Resistant Steel Products from the Republic of Korea," (June 12,

2021), PR 173.  Commerce issued the Final Results of the administrative review.

Final Results, 87 Fed. Reg. 2759; Final IDM.

## JURISDICTION AND STANDARD OF REVIEW

The U.S. Court of International Trade has jurisdiction pursuant to 19 U.S.C.

§ 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), which grant the Court authority to

review actions contesting the final results of an administrative review of a

countervailing duty order.  The Court shall hold unlawful any determination found

to be unsupported by substantial evidence on the record or otherwise not in

accordance with the law.  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.     Countervailable Subsidy Overview

A countervailable subsidy exists when a foreign government provides a financial contribution to a specific industry that confers a benefit upon a recipient within the industry.  19 U.S.C. § 1677(5); see also Fine Furniture (Shanghai) Ltd. v. United States, 748 F.3d 1365, 1369 (Fed. Cir. 2014).  For equity infusions, a benefit is conferred if "the investment decision is inconsistent with the usual investment practice of private investors, including the practice regarding the provision of risk capital, in the country in which the equity infusion is made."  19 U.S.C. § 1677(5)(E)(i); see also 19 C.F.R. § 351.507(a)(1) (defining a benefit for equity infusions).

Commerce considers an equity infusion to be inconsistent with usual investment practice if the price paid by the government for newly issued shares is greater than the price paid by private investors for the same (or similar form of) newly issued shares.  19 C.F.R. § 351.507(a)(2)(i).  Commerce does not consider private sector investor prices if Commerce concludes that private investor purchases of newly issued shares are not significant.  Id. § 351.507(a)(2)(iii). When significant private sector participation does not exist, Commerce determines whether the firm funded by the government-provided equity is equityworthy or unequityworthy at the time of the equity infusion.  Id. § 351.507(a)(3).  A

determination that the firm is unequityworthy constitutes a determination that the

equity infusion is inconsistent with the usual investment practice of private

investors, and therefore, that a benefit to the firm exists in the amount of the equity

infusion.  Id.; see also id. § 351.507(a)(6).

Commerce considers a firm to be equityworthy if Commerce determines

that, from the perspective of a reasonable private investor examining the firm at the

time the government-provided equity infusion took place, the firm showed an

ability to generate a reasonable rate of return within a reasonable period of time.

Id. § 351.507(a)(4)(i).  In making this determination, Commerce considers the

following factors: (A) an objective analysis of the future financial prospects of the

recipient firm, (B) current and past indicators of the recipient firm's financial

health, (C) rates of return on equity in the three years prior to the government

equity infusion, and (D) private investor equity investment into the recipient firm.

Id. § 351.507(a)(4)(i)(A)–(D).  Commerce may focus on the equityworthiness of a

specific project, in appropriate circumstances, rather than the company as a whole.

Id. § 305.507(a)(4)(i).

## II.     First Through Third Debt-to-Equity Restructurings

### A.     Whether Commerce's Determination is in Accordance with the Law

Plaintiffs argue that Commerce's determination that the first through third debt-to-equity restructurings provided a countervailable subsidy to KG Dongbu is not in accordance with the law because Commerce has an established practice for determining whether debt-to-equity restructurings provide a countervailable subsidy, but Commerce ignored that practice and failed to provide a reasonable explanation for departing from its established practice.  Pls.' Br. at 15–20. Defendant defends Commerce's determination and argues that "the majority of Commerce's argument in [the case cited by Plaintiffs to establish Commerce's alleged established practice] turned on the fact that the plaintiff . . . failed to exhaust its administrative remedies with respect to whether the private investors' participation and share were significant."  Def.'s Resp. Br. at 16.

If Commerce has a routine practice for addressing similar situations, it must either apply that practice or provide a reasonable explanation regarding why Commerce has deviated from that practice.  See SKF USA, Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("An agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently."); see also M.M. & P. Mar. Advancement, Training, Educ. & Safety Program v. Dep't of

Commerce, 729 F.2d 748, 755 (Fed. Cir. 1984) ("An agency is obligated to follow

precedent, and if it chooses to change, it must explain why."); see also Cinsa, S.A.

de C.V. v. United States, 21 CIT 341, 349, 966 F. Supp. 1230, 1238 (1997)

("Commerce can reach different determinations in separate administrative reviews

but it must employ the same methodology or give reasons for changing its

practice.").

     First, the Court finds that Commerce has a standard practice regarding not

reexamining the countervailability of Dongbu Steel's equity infusions.  There were

three separate debt-to-equity restructurings prior to the contested review, in

February 2015, May 2016, and April 2018.  See Certain Corrosion-Resistant Steel

Products from the Republic of Korea, Case No. C-580-879: Dongbu's Initial

Questionnaire Response (Dec. 3, 2020) ("KG Dongbu's IQR") at 40–46, PR 74–

78.  Commerce determined previously that no countervailable subsidy existed in

each of the three previous debt-to-equity restructurings.  Final IDM at 46–47.  In

Certain Corrosion-Resistant Steel Products From the Republic of Korea ("CORE

2018 Final Results"), 86 Fed. Reg. 29,237 (Dep't of Commerce June 1, 2021)

(final results and partial rescission of countervailing duty administrative review;

2018) and accompanying Issues and Decision Memorandum, Commerce

determined that the same debt-to-equity restructurings currently under review

provided no countervailable benefit.  Id. at 29,238.  As KG Dongbu highlights,

"the facts on the record regarding the first three [debt-to-equity restructurings]

were also on the record in the [CORE 2018 Final Results], except for documents

related to the third [debt-to-equity restructuring] that occurred in 2018, were also

on the record of the CORE 2015–2016 and 2017 Reviews."  Pls.' Br. at 16.

　　　The Court notes that Commerce reviewed the same debt-to-equity

restructurings as in previous reviews, though resulting in a different outcome here.

Compare Certain Corrosion-Resistant Steel Products From the Republic of Korea,

84 Fed. Reg. 11,749, 11,750 (Dep't of Commerce Mar. 28, 2019) (final results and

partial rescission of countervailing duty administrative review; 2015–2016) and

accompanying Issues and Decision Memorandum, and Certain Corrosion-Resistant

Steel Products From the Republic of Korea, 85 Fed. Reg. 15,112, 15,113 (Dep't of

Commerce Mar. 17, 2020) (final results of countervailing duty administrative

review; 2017) and accompanying Issues and Decision Memorandum, with Final

Results, 87 Fed. Reg. at 2760, and Final IDM at 54.  Significantly, the Court

observes that Commerce's standard countervailing duty questionnaire language

explicitly states that "[a]bsent new information warranting a program

reexamination, [Commerce] *will not reevaluate prior determinations regarding the*

*countervailability of programs*."  Administrative Review of Certain Corrosion-

Resistant Steel Products from the Republic of Korea: Countervailing Duty

Questionnaire (Oct. 6, 2020) at II-1, PR 22–23 (emphasis added).  Based on these

facts and the prior three debt-to-equity restructurings in February 2015, May 2016,

and April 2018, the Court concludes that Commerce has a standard practice of not

reexamining the countervailability of Plaintiffs' equity infusions absent new

information.

Second, in order to depart from Commerce's routine practice, Commerce

must provide a reasonable explanation.  SKF USA, Inc., 263 F.3d at 1382.  The

Court observes that Commerce has neither provided a sufficient explanation nor

cited new information on the record that relates to whether the first three debt-to-

equity restructurings provided a countervailable benefit.  Instead, as justification

for Commerce's decision to evaluate the first three debt-to-equity restructurings

anew, Commerce cited evidence based on the fourth debt-to-equity restructuring,

treating each debt-to-equity restructuring as part of one ongoing transaction rather

than four separate, independent transactions.  In the Final IDM, addressing KG

Dongbu's argument that Commerce departed from its established practice by

reexamining its prior determinations with respect to the first three debt-to-equity

restructurings, Commerce reasoned that "Commerce's benefit determinations in

each segment of a proceeding stand on their own and are made on a fact-specific

basis."  Final IDM at 46 (citing Hyundai Steel Co. v. United States, 42 CIT __, __,

319 F. Supp. 3d 1327, 1342 n.13 (2018)).  Commerce explained that it reexamines

findings of financial contribution and specificity made in a prior segment of the

same proceeding when new evidence necessitates reexamination.  Id. at 46.  As

justification for Commerce's decision to reevaluate its prior determinations,

Commerce noted that:

> While the record evidence shows that private creditors accounted for
> the same debt-to-equity conversion amounts as in the prior reviews, we
> cannot rely on this fact alone to assess whether KG Dongbu was
> equityworthy between 2014 and 2018.  This is because in the instant
> review, unlike in the prior reviews, there were private investors
> independent from the creditors' committee involved in the fourth equity
> infusion during the 2019 [period of review].  This inclusion of private
> investors was a factual change from prior reviews that led us to
> reconsider the role [Korean Development Bank] played in its control of
> the creditors' committee.

Id. at 47.  KG Dongbu argues, however, that the record evidence is not new, and is

the same evidence considered by Commerce in the first three debt-to-equity

restructuring determinations.  Pls.' Br. at 15–20.  The Court notes that the record

evidence cited by Commerce as justification for its deviation from its past practice

does not deal directly with the first through third debt-to-equity restructurings and

is not a sufficient explanation to justify departing from its standard practice.  See

Final IDM at 47 (citing KG Dongbu's IQR at 44); see also KG Dongbu's IQR at

44 (discussing new private investors involved in the fourth debt-to-equity

restructuring as a factual distinction from the first three debt-to-equity

restructurings).  Instead, Defendant justifies Commerce's determination by arguing

that Plaintiff seeks to "decontextualize the various rounds of the restructuring

program[,]" Def.-Interv.'s Resp. Br. at 16, not by citing new evidence about the first through third debt-to-equity restructurings that came to light after Commerce had made prior determinations regarding the first through third debt-to-equity restructurings.

Because Commerce failed to provide an adequate explanation for its decision to deviate from its prior determinations, the Court concludes that Commerce's determination is arbitrary and not in accordance with the law.  The Court remands Commerce's determination that the first through third debt-to-equity restructurings provided a countervailable subsidy to KG Dongbu for reconsideration or further explanation.

### B.   Whether Commerce's Determination is Supported by Substantial Evidence

Plaintiffs argue that Commerce's determination to treat the first through third debt-to-equity restructurings as countervailable subsidies to KG Dongbu is not supported by substantial evidence.  Pls.' Br. at 23–29.  Because the Court is remanding Commerce's determination as not in accordance with the law, the Court also remands the issue for consideration of whether Commerce's determination is supported by substantial evidence.

**III.    Whether Commerce's Determination Regarding Debt-to-Equity Restructuring Benefits Pass Through is Supported by Substantial Evidence**

Plaintiffs argue that Dongbu properly declined to submit a response to Commerce's Change-in-Ownership Appendix with its initial questionnaire response because Commerce had not found that any non-recurring subsidies provided benefits to Dongbu at that time.  Id. at 29.  Plaintiffs contend that "record evidence demonstrates that Dongbu's change in ownership occurred at arm's length and for fair market value such that any alleged subsidies from the first through third [debt-to-equity restructurings] were extinguished[,]" therefore, "even if the Court finds that Commerce's disregard of its prior practice is lawful, the record shows that any benefits associated with the [debt-to-equity restructurings] did not pass through to KG Dongbu Steel[,]" but were instead "extinguished by the arm's-length purchase of Dongbu by the KG Consortium."  Id.  Defendant asserts that Commerce presumes that a non-recurring subsidy benefits a recipient "over the average useful life of the relevant assets[.]"  Def.'s Resp. Br. at 19.  Defendant argues that a respondent may rebut this presumption by proving that a change in ownership occurred in which the previous owner sold all or substantially all of a company or its assets in an arm's length sale for fair market value.  Id. at 19–20.

As noted above, the Court is remanding Commerce's determination as not in accordance with the law based on Commerce's arbitrary departure from prior

practice without sufficient explanation.  On remand, Commerce may reconsider the

record with respect to whether KG Dongbu received any countervailable subsidies;

therefore, the Court also remands this issue for Commerce to reconsider whether

substantial evidence supports a determination that any change in ownership

occurred at arm's length and for fair market value that extinguished any alleged

subsidies from the first through third debt-to-equity restructurings to KG Dongbu.

### IV.   Whether Commerce's Uncreditworthy Benchmark Rate Determination is Supported by Substantial Evidence

Plaintiffs contend that Commerce incorrectly applied the formula for

calculating the uncreditworthy benchmark rate.  Pls.' Br. at 36.  Plaintiffs assert

that KG Dongbu's outstanding long-term loans and bonds were restructured during

the period of review, thus creating "new" loans and bonds with a term of six years.

Id.  Plaintiffs argue, however, that Commerce's calculation of the benefit from the

"new" loans that were restructured during the period of review used an incorrect

three-year interest rate to measure the countervailable loans and bonds.  Id. at 36–

37.

Defendant asserts that Commerce correctly applied its regulations regarding

the uncreditworthy discount rate and calculated the rate based upon evidence on

the record.  Def.'s Resp. Br. at 23.  Defendant argues that Commerce used a

correct three-year interest rate as the long-term interest rate paid because no other

interest rates were available.  Id. at 24; see Final IDM at 58.  Commerce

determined that it could not use the six-year interest rate paid by a credit-worthy

company because there was no information on the record regarding any six-year

interest rate paid by a credit-worthy company.  Final IDM at 58.  Plaintiffs contend

that Commerce had all the information necessary to calculate the benchmark rate

and that the term of the loan was six years, not three.  Oral Arg. at 4:20–5:20, June

2, 2023, ECF No. 50 (citing KG Dongbu's IQR at 45).

In the case of a loan, a benefit exists to the extent that the amount a firm

pays on the government-provided loan is less than the amount the firm would have

paid on a comparable commercial loan that the firm could obtain on the market.

19 C.F.R. § 351.505(a)(1).  Under normal circumstances, Commerce will rely on

effective interest rates.  Id.  However, when a firm is deemed uncreditworthy,

Commerce calculates the interest rate pursuant to a specific formula:

$i_b = [(1-q_n)(1+i_f)^n/(1-p_n)]^{1/n} - 1$

where:

$n$ = the term of the loan;

$i_b$ = the benchmark interest rate for uncreditworthy companies;

$i_f$ = the long-term interest rate that would be paid by a creditworthy company;

$p_n$ = the probability of default by an uncreditworthy company within n years; and

$q_n$ = the probability of default by a creditworthy company within n years.

Id. The benefit conferred by an equity infusion shall be allocated over the same period as a non-recurring subsidy.  Id. § 351.507(c).  Commerce determined that KG Dongbu was uncreditworthy and thus used the uncreditworthy benchmark formula in 19 C.F.R. § 351.505(a)(3)(iii).  Final IDM at 58.

Despite Commerce's assertion that there was no information on the record regarding any six-year interest rate, id. at 58, Plaintiffs cite potentially contrary record evidence indicating that the "[r]epayment date of outstanding loans was extended from December 31, 2020 to December 31, 2025[.]"  Oral Arg. at 4:20–5:20, June 2, 2023, ECF No. 50 (citing KG Dongbu's IQR at 45).  Thus, the Court observes that the record evidence seemingly indicates that the loan term might be closer to six years and not three years, and Commerce should at least consider the record evidence and further substantiate the loan term used in its redetermination. The Court concludes that Commerce's application of the relevant formula and subsequent determination was not supported by substantial evidence because Commerce should consider the potentially contrary evidence presented by Plaintiffs.  The Court remands this issue for Commerce to reconsider the calculation of KG Dongbu's interest rate.

**V.    Whether Commerce's Unequityworthy Discount Rate
Determination is Supported by Substantial Evidence**

Plaintiffs argue that Commerce incorrectly calculated the discount rates in

determining the amount of the benefit in each year of the fifteen-year allocation

periods for the average useful life of the relevant assets.  Pl.'s Br. at 40–41.

Defendant contends that Commerce could not use a six-year creditworthy interest

rate because there was no information regarding a six-year interest rate paid by a

creditworthy company on the record.  Def.'s Br. at 24.

As noted above, the Court is remanding for Commerce to reconsider

whether the record evidence establishes a loan term of six years or three years.

The Court also remands Commerce's calculation of discount rates in determining

the amount of the benefit in each year of the fifteen-year allocation periods for the

average useful life of the relevant assets based on Commerce's reconsideration of

the record evidence.

**CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED** that the Final Results, 87 Fed. Reg. 2759, are remanded to

Commerce for reconsideration consistent with this opinion; and it is further

**ORDERED** that this case shall proceed according to the following schedule:

(1)    Commerce shall file the remand determination on or before

October 5, 2023;

(2)     Commerce shall file the administrative record on or before

        October 18, 2023;

(3)     Comments in opposition to the remand determination shall be

        filed on or before November 20, 2023;

(4)     Comments in support of the remand determination shall be filed

        on or before December 20, 2023; and

(5)     The joint appendix shall be filed on or before January 19, 2024.


                                        ____/s/ Jennifer Choe-Groves____
                                        Jennifer Choe-Groves, Judge


Dated:  July 7, 2023
        New York, New York

Slip Op. 24-38

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **KG DONGBU STEEL CO., LTD., DONGBU STEEL CO., LTD., and DONGBU INCHEON STEEL CO., LTD.,** | |
| **Plaintiffs,** | |
| **v.** | **Before:  Jennifer Choe-Groves, Judge** |
| **UNITED STATES,** | **Court No. 22-00047** |
| **Defendant,** | |
| **and** | |
| **NUCOR CORPORATION and STEEL DYNAMICS, INC.,** | |
| **Defendant-Intervenors.** | |

## <u>OPINION</u>

[Remanding the U.S. Department of Commerce's Final Results of Redetermination Pursuant to Court Order in the countervailing duty review of certain corrosion-resistant steel products from the Republic of Korea.]

Dated:  April 3, 2024

<u>Brady W. Mills</u>, <u>Donald B. Cameron</u>, <u>Julie C. Mendoza</u>, <u>R. Will Planert</u>, <u>Mary S. Hodgins</u>, <u>Eugene Degnan</u>, <u>Jordan L. Fleischer</u>, <u>Nicholas C. Duffey</u>, and <u>Stephen Morrison</u>, Morris, Manning & Martin, LLP, of Washington, D.C., for Plaintiffs KG Dongbu Steel Co., Ltd., Dongbu Steel Co., Ltd., and Dongbu Incheon Steel Co., Ltd.

Claudia Burke, Assistant Director, and Elizabeth Speck, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States.   With them on the brief were Brian M. Boynton, Principal Deputy Assistant Attorney General, and Patricia M. McCarthy, Director.   Of Counsel was Ashlande Gelin, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Alan H. Price, Christopher B. Weld, Tessa V. Capeloto, and Adam M. Teslik, Wiley Rein LLP, of Washington, D.C., for Defendant-Intervenor Nucor Corporation.   Derick G. Holt, Enbar Toledano, Maureen Elizabeth Thorson, Paul A. Devamithran, Robert Edward DeFrancesco, III, and Theodore P. Brackemyre also appeared.

Roger B. Schagrin, Christopher T. Cloutier, Elizabeth Jackson Drake, Jeffrey D. Gerrish, Luke A. Meisner, Michelle R. Avrutin, Nicholas J. Birch, Saad Y. Chalchal, and William A. Fennell, Schagrin Associates, of Washington, D.C., for Defendant-Intervenor Steel Dynamics, Inc.

        Choe-Groves, Judge:  Plaintiffs KG Dongbu Steel Co., Ltd., Dongbu Steel

Co., Ltd., and Dongbu Incheon Steel Co., Ltd. (collectively "KG Dongbu" or

"Plaintiffs") filed this action challenging the U.S. Department of Commerce's

("Commerce") fourth administrative review of Certain Corrosion-Resistant Steel

Products from the Republic of Korea ("Final Results"), 87 Fed. Reg. 2759 (Dep't

of Commerce Jan. 19, 2022) (final results and partial rescission of countervailing

duty administrative review; 2019), and the accompanying Issues and Decision

Memorandum for the Final Results and Partial Rescission of the 2019

Administrative Review of the Countervailing Duty Order on Certain Corrosion-

Resistant Steel Products from the Republic of Korea ("IDM"), PR 213.[1]  The Court

remanded the case to Commerce for reconsideration.  <u>KG Dongbu Steel Co., Ltd.</u>

<u>v. United States</u> ("<u>KG Dongbu I</u>"), 47 CIT __, 648 F. Supp. 3d 1353 (2023).  Now

before the Court are Commerce's Final Results of Redetermination Pursuant to

Court Remand ("<u>Remand Redetermination</u>"), ECF Nos. 57-1, 58-1.  For the

following reasons, the Court remands the <u>Remand Redetermination</u>.

<strong>ISSUES PRESENTED</strong>

The Court reviews the following issues:

1.    Whether Commerce's determination on remand that the first

three debt-to-equity restructurings provided a countervailable

subsidy to KG Dongbu was supported by substantial evidence

and in accordance with law;

2.    Whether Commerce's remand determination that the benefits

from the first three debt-to-equity restructurings passed through

to KG Dongbu despite the change in ownership was supported

by substantial evidence and in accordance with law;

3.    Whether Commerce's calculation of the uncreditworthiness

---

[1]  Citations to the administrative record reflect the public record ("PR") and public remand record (PRR) numbers filed in this case, ECF Nos. 44, 71.

benchmark for purposes of measuring the benefit from KG

Dongbu's debt-to-equity restructuring was supported by

substantial evidence; and

4.    Whether Commerce's calculation of the uncreditworthy

discount rate for purposes of measuring the benefits from the

debt-to-equity restructurings was supported by substantial

evidence.

## BACKGROUND

The Court presumes familiarity with the underlying procedural history of

this case as set forth in KG Dongbu Steel Co., Ltd. v. United States ("KG Dongbu

I"), 47 CIT __, __, 648 F. Supp. 3d 1353, 1356 (2023).

Commerce published its countervailing duty order on July 25, 2016.  Certain

Corrosion-Resistant Steel Products from India, Italy, Republic of Korea, and the

People's Republic of China, 81 Fed. Reg. 48,387 (Dep't of Commerce July 25,

2016) (countervailing duty order).  Commerce initiated an administrative review of

the countervailing duty order on certain corrosion-resistant steel products from the

Republic of Korea ("Korea") for the period of January 1, 2019 to December 31,

2019, and selected KG Dongbu and Hyundai Steel Company as mandatory

respondents.  Initiation of Antidumping and Countervailing Duty Administrative

Reviews, 85 Fed. Reg. 54,983, 54,990–91 (Dep't of Commerce Sep. 3, 2020);

<u>Final Results</u>, 87 Fed. Reg. at 2760.

Commerce issued the preliminary results of the administrative review, in which Commerce calculated a 10.52% subsidy rate for KG Dongbu.  <u>Certain Corrosion-Resistant Steel Products from the Republic of Korea</u> ("<u>Preliminary Results</u>"), 86 Fed. Reg. 37,740 (Dep't of Commerce July 15, 2021) (preliminary results of countervailing duty administrative review; 2019); Decision Memorandum for the Preliminary Results of the Countervailing Duty Administrative Review; 2019: Certain Corrosion-Resistant Steel Products from the Republic of Korea ("PDM"), PR 173.  Commerce issued the <u>Final Results</u> of the administrative review, in which Commerce calculated a 10.51% subsidy rate for KG Dongbu and assigned the same rate to non-selected companies.  <u>Final Results</u>, 87 Fed. Reg. at 2760.

On appeal, Plaintiffs challenged: (1) Commerce's determination that the first through third debt-to-equity restructurings provided a countervailable subsidy; (2) Commerce's determination that the sale of Dongbu Steel Co., Ltd. ("Dongbu Steel") was not arm's length for fair market value; (3) Commerce's calculation of the uncreditworthiness benchmark for purposes of measuring the benefit from KG Dongbu's restructured long term loans and bonds; and (4) Commerce's calculation of the unequityworthy discount rate for purposes of measuring the benefits from the equity infusions from government-controlled creditors.  Pls.' Mot. J. Agency

R., ECF Nos. 33, 34; Pls.' Opening Br., ECF Nos. 33-2, 34-2; Reply Br. Pls.'

Supp. Mot. J. Agency R., ECF Nos. 40, 41.  Defendant United States

("Defendant") and Defendant-Intervenor Nucor Corporation ("Defendant-

Intervenor" or "Nucor") argued that the Court should sustain the Final Results.

Def.'s Resp. Pls.' Mot. J. Agency R., ECF Nos. 35, 36; Def.-Interv.'s Resp. Mot. J.

Agency R., ECF Nos. 37, 38, 39.

     The Court observed that Commerce had considered the first through third

debt-to-equity restructurings in each of the first three administrative reviews of the

countervailing duty order.  KG Dongbu I, 47 CIT at __, 648 F. Supp. 3d at 1358.

In each of the three prior administrative reviews, Commerce had determined that

the debt-to-equity restructurings did not provide a countervailable benefit to KG

Dongbu because private creditors had participated in those debt-to-equity

restructurings and had agreed to swap debt for equity on the same terms as the

government creditors.  See Certain Corrosion-Resistant Steel Products from the

Republic of Korea, 84 Fed. Reg. 11,749 (Dep't of Commerce Mar. 28, 2019) (final

results and partial rescission of countervailing duty administrative review; 2015-

2016) and accompanying Issues and Decision Memorandum; Certain Corrosion-

Resistant Steel Products from the Republic of Korea, 85 Fed. Reg. 15,112 (Dep't

of Commerce Mar. 17, 2020) (final results of countervailing duty administrative

review; 2017) and accompanying Issues and Decision Memorandum; Certain

Corrosion-Resistant Steel Products from the Republic of Korea, 86 Fed. Reg. 29,237 (Dep't of Commerce June 1, 2021) (final results and partial rescission of countervailing duty administrative review; 2018) and accompanying Issues and Decision Memorandum.  Commerce did not conduct an unequityworthiness analysis in any of those first three administrative reviews.

The fourth administrative review also involved a fourth debt-to-equity restructuring.  See IDM at 15.  Commerce determined that the evidence showed that private banks had (1) participated in the three debt-to-equity restructurings at issue, (2) paid the same per share price as the government-controlled policy banks, and (3) purchased a significant percentage of the shares of debt that were converted to equity.  See generally Countervailing Duty Administrative Review of Certain Corrosion-Resistant Steel Products from the Republic of Korea: Preliminary Analysis Memorandum—Equity Infusions ("Equity Infusions Analysis Memorandum" or "Equity Infusions Analysis Mem."), P.R. 176; see also PDM at 11–12.  Commerce thus determined that, pursuant to 19 C.F.R. § 351.507(a)(2)(i), the equity infusions in the fourth debt-to-equity restructuring were inconsistent with usual investment practices of private investors.  Equity Infusions Analysis Mem. at 13.

During the fourth administrative review, Commerce also re-examined the first three debt-to-equity restructurings, found that KG Dongbu was

unequityworthy at their respective placements, and determined that the

restructurings had in fact provided a benefit each time to KG Dongbu, as detailed

in the Equity Infusions Analysis Memorandum. Id. at 10–13. Commerce

determined that the benefits of the first through third debt-to-equity restructurings

were countervailable because Commerce had previously determined that those debt

restructurings satisfied the specificity requirement of countervailability. IDM at

46–47; see 19 U.S.C. § 1677(5A).

Upon consideration of Plaintiffs' appeal, this Court concluded that

Commerce had a standard practice of not reexamining the countervailability of a

respondent's equity infusions absent new information and had not provided a

reasonable explanation for departing from that practice, and the Court remanded

the Final Results for reconsideration or further explanation. KG Dongbu I, 47 CIT

at __, 648 F. Supp. 3d at 1357–59. This Court reasoned that all the information

cited by Commerce regarding the first through third debt-to-equity restructurings

were based on existing record evidence that had been thoroughly considered in the

previous reviews, and that no new information impacted the facts surrounding the

fourth debt-to-equity restructuring. Specifically, "the record evidence cited by

Commerce as justification for its deviation from its past practice does not deal

directly with the first through third debt-to-equity restructurings and is not a

sufficient explanation to justify departing from its standard practice." Id. at __,

648 F. Supp. 3d at 1359.  The fourth administrative review was based on the same

record as the first through third reviews, and thus Commerce did not provide a

sufficient explanation or cite new substantial evidence to justify departing from the

prior three reviews in the fourth administrative review.

The Court remanded for Commerce to reconsider or further explain: (1) its

determination that the first through third debt-to-equity restructurings provided a

countervailable benefit; (2) its determination that the benefits from the debt-to-

equity restructurings "passed through" to Plaintiffs despite the change in

ownership; (3) whether Commerce's calculations of the uncreditworthy benchmark

rate are supported by substantial evidence; and (4) whether Commerce's

calculations of the unequityworthy discount rate are supported by substantial

evidence.  Id. at __, 648 F. Supp. 3d at 1357–61.

Commerce filed its Remand Redetermination maintaining that all of its

original determinations were correct.  In summary, Commerce reiterated on

remand that Commerce was attempting to fix in the fourth administrative review a

"mistake" that it had made in the three prior administrative reviews, but Commerce

again failed to cite substantial record evidence or provide an adequate explanation

for departing from its prior determinations that the first three debt-to-equity

restructurings did not provide countervailable benefits.  In addition, Commerce

explained on remand that it would assess countervailable benefits as a pass through

for the prior three years of review (despite its prior determinations that Commerce

would not countervail benefits in the first three years of review), plus would assess

countervailable benefits for the fourth year of review, without citing substantial

record evidence or providing an adequate explanation for this change in practice.

Plaintiffs challenged Commerce's <u>Remand Redetermination</u> in Plaintiffs KG

Dongbu Steel Co., Ltd., Dongbu Steel Co., Ltd., and Dongbu Incheon Steel Co.,

Ltd.'s Comments on Commerce's Redetermination Pursuant to Court Remand.

Pls.' Cmts. Commerce's Redetermination Pursuant Court Remand ("KG Dongbu's

Cmts."), ECF Nos. 60, 61.  Defendant defended Commerce's <u>Remand</u>

<u>Redetermination</u> in Defendant's Response to Plaintiffs' Comments on Commerce's

Remand Redetermination.  Def.'s Resp. Pls.' Cmts. Commerce's Remand

Redetermination ("Def.'s Resp."), ECF Nos. 65, 66.  Nucor filed Comments in

Support of Remand Redetermination.  Nucor's Cmts. Supp. Remand

Redetermination ("Nucor's Cmts."), ECF Nos. 67–69.

## JURISDICTION AND STANDARD OF REVIEW

The U.S. Court of International Trade has jurisdiction pursuant to 19 U.S.C.

§ 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), which grant the Court authority to

review actions contesting the final results of an administrative review of a

countervailing duty order.  The Court will hold unlawful any determination found

to be unsupported by substantial record evidence or otherwise not in accordance

with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  The Court reviews determinations made

on remand for compliance with the Court's remand order.  Ad Hoc Shrimp Trade

Action Comm. v. United States, 38 CIT 727, 730, 992 F. Supp. 2d 1285, 1290

(2014), aff'd, 802 F.3d 1339 (Fed. Cir. 2015).

## DISCUSSION

### I.    Countervailable Subsidy Overview

A countervailable subsidy exists when a foreign government provides a

financial contribution to a specific industry that confers a benefit upon a recipient

within the industry.  19 U.S.C. § 1677(5); see also Fine Furniture (Shanghai) Ltd.

v. United States, 748 F.3d 1365, 1369 (Fed. Cir. 2014).  For equity infusions, a

benefit is conferred if "the investment decision is inconsistent with the usual

investment practice of private investors, including the practice regarding the

provision of risk capital, in the country in which the equity infusion is made."  19

U.S.C. § 1677(5)(E)(i); see also 19 C.F.R. § 351.507(a)(1) (defining a benefit for

equity infusions).

Commerce considers an equity infusion to be inconsistent with usual

investment practice if the price paid by the foreign government for newly issued

shares is greater than the price paid by private investors for the same (or similar

form of) newly issued shares.  19 C.F.R. § 351.507(a)(2)(i).  Commerce does not

consider private sector investor prices if Commerce concludes that private investor

purchases of newly issued shares are not significant.  Id. § 351.507(a)(2)(iii).

When significant private sector participation does not exist, Commerce determines

whether the firm funded by the foreign government-provided equity is

equityworthy or unequityworthy at the time of the equity infusion.  Id.

§ 351.507(a)(3).  A determination that the firm is unequityworthy constitutes a

determination that the equity infusion is inconsistent with the usual investment

practice of private investors, and therefore, that a benefit to the firm exists in the

amount of the equity infusion.  Id.; see also id. § 351.507(a)(6).

Commerce considers a firm to be equityworthy if Commerce determines

that, from the perspective of a reasonable private investor examining the firm at the

time the foreign government-provided equity infusion took place, the firm showed

an ability to generate a reasonable rate of return within a reasonable period of time.

Id. § 351.507(a)(4)(i).  In making this determination, Commerce considers the

following factors: (A) an objective analysis of the future financial prospects of the

recipient firm; (B) current and past indicators of the recipient firm's financial

health; (C) rates of return on equity in the three years prior to the foreign

government equity infusion; and (D) private investor equity investment into the

recipient firm.  Id. § 351.507(a)(4)(i)(A)–(D).  Commerce may focus on the

equityworthyness of a specific project, in appropriate circumstances, rather than

the company as a whole.  Id. § 305.507(a)(4)(i).

## II.    First Through Third Debt-to-Equity Restructurings

Commerce's Remand Redetermination attempted to explain the rationale for

departing from its previous findings that the first three debt-to-equity restructurings

provided no countervailable subsidy.

Commerce explained that absent new information, Commerce does not

usually re-evaluate prior determinations on countervailability—by which

Commerce means it will not normally revisit prior financial contribution and

specificity determinations absent new information. Remand Redetermination at 6–

7 (citing Magnola Metallurgy, Inc. v. United States, 508 F.3d 1349 (Fed. Cir.

2007) and PPG Industries, Inc. v. United States, 978 F.2d 1232 (Fed. Cir. 1992)).

Commerce had previously determined that KG Dongbu's first three debt-to-equity

restructurings, including the debt-to-equity infusions, constituted financial

contributions and were specific; therefore, Commerce was not revisiting those

determinations consistent with its practice. Id. at 7. Because the "amount" of any

benefit conferred to a company can vary between periods of review, Commerce

claimed that it was necessary to examine the "amount" of such benefit in each

period of review, consistent with 19 U.S.C. § 1675(a)(1)(A) and 19 U.S.C.

§ 1677(5)(E). Id.

The Remand Redetermination explained that during the fourth

administrative review, the new fourth debt-to-equity infusion caused Commerce to

reevaluate the "total benefit" conferred under the four debt-to-equity restructurings

in order to calculate a single subsidy rate for the debt-to-equity infusion program.

Id. at 22.  Commerce claimed that when it re-examined the benefit conferred from

the fourth equity infusion during the period of review, it realized that it "had made

a mistake in the prior review," specifically that the "prior finding that no benefit

was conferred by the first three debt-to-equity restructurings was inconsistent

with" 19 C.F.R. § 351.507.  Id. at 8.  In addition, Commerce relied on Nucor

Corporation v. United States ("Nucor"), 45 CIT __, 494 F. Supp. 3d 1377 (2021),

which sustained Commerce's determination in the 2015–2016 administrative

review not to use KG Dongbu's private bank loans as a loan benchmark because

these loans had been provided as part of a government loan program.  Id. at 9

(citing Nucor, 45 CIT at __, 494 F. Supp. 3d at 1381).  Commerce determined that

using KG Dongbu's private bank loans as a benchmark for the debt-to-equity

infusions in this administrative review would be inconsistent with its regulations as

well as Nucor.  Id.  Therefore, Commerce determined in the Remand

Redetermination that Commerce had to reevaluate its "prior determination of the

benefit under the debt-to-equity infusions."  Id.

Regarding the Court's remand instruction to explain how Commerce's

determination in this review is supported by substantial evidence, the Remand

Redetermination stated that "Commerce considers an equity infusion to be

inconsistent with usual investment practice if the price paid by the foreign

government for newly issued shares is greater than the price paid by private

investors for the same (or similar form of) newly issued shares," and it does not

consider private sector investor prices if Commerce concludes that private investor

purchases of newly issued shares are "not significant."  Id. at 10 (citing 19 C.F.R.

§ 351.507(a)(2)(i), (iii)).  The Remand Redetermination referred to the Equity

Infusions Analysis Memorandum, which concluded that evidence such as the

underlying agreements and the ownership of KG Dongbu indicated that the Korea

Development Bank, as a government-controlled policy bank, exercised significant

influence over the debt-to-equity restructurings.  Id. (citing Equity Infusions

Analysis Mem.).

　　　According to Commerce, this meant that private creditors on the creditors

councils were considering how best to limit their losses instead of evaluating the

reasonableness of the rate of return on any equity they were considering investing

in the company in each debt-to-equity restructuring.  Id.  Commerce claimed that

its practice of analyzing the significance of private investor participation focused

on the perspective of an outside investor, not an existing investor that was simply

trying to minimize its losses.  Id. at 11.  Because of the percentage of shares owned

by government-controlled creditors compared to private creditors, Commerce

determined that the participation of KG Dongbu's private creditors in the first,

second, and third equity infusions was not significant.  Id.  Accordingly,

Commerce determined that it could not "rely on the prices paid by the private

creditors on the creditors councils for the purpose of determining a benchmark."

Id.

       An administrative agency generally has authority to reconsider its decisions

if there is no specific statutory limitation to do so.  Tokyo Kikai Seisakusho, Ltd. v.

United States, 529 F.3d 1352, 1360 (Fed. Cir. 2008) ("[C]ourts have uniformly

concluded that administrative agencies possess inherent authority to reconsider

their decisions, subject to certain limitations, regardless of whether they possess

explicit statutory authority to do so." (citations omitted)).  Commerce must still

provide a reasonable explanation for treating similar situations differently, in this

instance based on its own standard.  See SKF USA Inc. v. United States ("SKF

USA"), 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("[A]n agency action is arbitrary

when the agency offer[s] insufficient reasons for treating similar situations

differently." (quoting Transactive Corp. v. United States, 91 F.3d 232, 237 (D.C.

Cir. 1996) (alteration in original))).  Commerce's Remand Redetermination does

not satisfy that standard.

       The only reason for Commerce to re-examine the countervailability of the

prior debt-to-equity restructurings is "new information," according to its own

statements.  See, e.g., Administrative Review of Certain Corrosion-Resistant Steel

Products from the Republic of Korea: Countervailing Duty Questionnaire ("Initial

Questionnaire"), Section III at III-1, PR 22–23 ("Absent new information

warranting a program reexamination, we will not reevaluate prior determinations

regarding the countervailability of programs.  This includes determinations that

previously examined programs are or are not countervailable.").  Commerce on

remand points to no new information on the record that it has not already

considered in its prior final determinations that there were no countervailable

benefits in KG Dongbu's first three debt-to-equity restructurings.

     The Court observes that Commerce has failed twice, in the Final Results and

the Remand Redetermination, to cite any new information or provide a reasonable

explanation for its attempted reversal of its prior determinations in three completed

administrative reviews in which Commerce determined before that the same debt-

to-equity restructurings currently under review provided no countervailable

benefits.  Without citing any new record evidence or providing a reasonable

explanation, Commerce simply states that it "made a mistake" and now determines

that countervailable benefits were conferred during the past three administrative

reviews.  Commerce's determination is not supported by substantial evidence

because it does not satisfy the standard in SKF USA (requiring Commerce to

provide a reasonable explanation for treating similar situations differently).  SKF

USA, 263 F.3d at 1382.  The Court holds that Commerce's determination that the same debt-to-equity restructurings in the prior three administrative reviews are now countervailable is arbitrary and not supported by substantial evidence.

In addition, Commerce determined here that the debt-to-equity restructurings in the first through fourth administrative reviews were countervailable and the financial benefits would be "passed through" and allocated across all four years of the administrative reviews.  See Remand Redetermination at 22.  The Equity Infusions Analysis Memorandum analyzed the first through third debt-to-equity restructurings as integral financial parts from the past that are tied to the fourth debt-to-equity swap, such that there is a single subsidy program.  See Equity Infusions Analysis Mem. at 9 ("In this review, Commerce is analyzing four debt-to-equity conversions because the conversions are non-recurring and attributed to the average-useful-life (AUL) period.").  Commerce has already determined, however, that the first three debt-to-equity restructurings of that "program" provided no benefit for KG Dongbu.  There are therefore no benefits from those first three debt-to-equity restructurings to be included, or re-examined, in Commerce's calculations of the fourth debt-to-equity restructuring.  The Court concludes that Commerce's determination to pass through or allocate financial benefits to years one through four of the administrative reviews is arbitrary and not supported by substantial evidence, given Commerce's prior completed

administrative reviews determining that no countervailable benefits were conferred during years one through three.

The statute requires Commerce to "review and determine the amount of any net countervailable subsidy." 19 U.S.C. § 1675(a)(1)(A). If Commerce determines in a prior administrative review that there has been no benefit (*i.e.*, no "amount"), and no new information is presented in a subsequent administrative review, such as fraud or mistake of fact, that would call into question that prior determination, then the prior determination equates to a determination of no countervailable subsidy. Whether or not Commerce made a mistake in its prior analyses, the facts of the prior reviews remain the same in this administrative review. In other words, regardless of whether Commerce had to calculate "a single subsidy rate for the debt-to-equity infusion program," those prior final determinations of "no benefit" based on record evidence were carried over into Commerce's calculus for the fourth administrative review in the absence of new information relating to those prior determinations. KG Dongbu explains this more succinctly:

> The need to recalculate the amount of benefit in each review is only necessary in cases where Commerce has previously found the program to be countervailable. Only then is Commerce calculating a new benefit "amount" in each review. However, in cases such as this one where Commerce had consistently found that the first three [debt-to-equity restructurings] did not provide a countervailable subsidy there was no need to recalculate any benefit because there was none.

KG Dongbu's Cmts. at 4.

Defendant argues that Commerce had "good cause" to re-examine the first through third debt-to-equity restructurings because it "needed to correct a mistake that it had realized that it made in a prior review." Def.'s Resp. at 7. Commerce claimed that it did not analyze the first through third debt-to-equity restructurings correctly from the perspective of what a private investor would pay for shares consistent with 19 C.F.R. § 351.507(a)(2)(i). See Remand Redetermination at 8–12. The Court concludes that Commerce did not adequately articulate the nature of its alleged mistake. Commerce simply and summarily determined (without citing substantial evidence) in this fourth administrative review that "[p]rivate creditors on the creditors councils did not evaluate the reasonableness of the rate of return on any equity they were considering investing in the company in each debt-to-equity conversion," but the private creditors were rather "considering how best to limit their losses." Id. at 10. Their participation in the first through third debt-to-equity restructurings, therefore, was "not significant," resulting in Commerce undertaking an equityworthiness analysis. Id. at 11. The Court concludes that Commerce failed to provide a reasonable explanation and failed to cite new information or a mistake of fact regarding the first three administrative reviews

that would warrant reversing Commerce's prior final determinations that the first three debt-to-equity restructurings resulted in no countervailable benefits.

Any need to recalculate a benefit amount for each review is inapplicable for this particular program.  Unlike determining the amount of a benefit under a subsidy program that changes year to year, the benefit determination to be calculated here for the fourth administrative review had nothing to do with the amounts of benefits from the first three debt-to-equity restructurings that had been calculated for past administrative reviews.  Commerce usually allocates a non-recurring benefit, such as the debt-to-equity restructurings in this case, over a number of years that correspond to the average useful life allocation period.  19 C.F.R. § 351.524(b).

Commerce's attempt to rely on the existence of the fourth debt-to-equity restructuring as the basis for why it had to reconsider the benefit element for the first three debt-to-equity restructurings is unpersuasive.  More specifically, Commerce argues that it was required to calculate a benefit for the entire debt-to-equity restructuring program and that its "benefit calculation for [the 2019 administrative review] is a single rate which includes benefits conferred for all four of the equity infusions."  Remand Redetermination at 23.  The fact that Commerce added up the benefit amounts for each of the four debt-to-equity restructurings to arrive at a total benefit from the debt-to-equity restructuring program, however, did

not change the fact that separate benefit amounts were calculated for each debt-to-

equity restructuring, as detailed in Commerce's final calculations data.  See Final

Results Calculation for KG Dongbu Steel Co., Ltd. and Dongbu Incheon Steel Co.,

Ltd. ("Final Calculations Mem."), PR 214.  Commerce did not need to revisit its

prior determinations that there were no benefits from the first three debt-to-equity

restructurings just because Commerce found that there was a benefit from the

fourth debt-to-equity restructuring.

      Commerce's reliance on Nucor is also unpersuasive.  Nucor concerned

whether the loans by the private commercial banks on the creditors committee

constituted "comparable commercial loans" for purposes of 19 C.F.R.

§ 351.505(a)(2).  Nucor, 45 CIT __, 494 F. Supp. 3d at 1380.  Nucor's remand was

not concerned with whether private investor participation was significant for

purposes of equity infusions considered under 19 C.F.R. § 351.507(a)(2)(iii),

which is a separate regulation and separate consideration.  In the Nucor litigation,

Commerce defended its determination that private investor participation was

significant and thus there were no countervailable benefits from the first three

debt-to-equity restructurings.  See Nucor Corp. v. United States, Consol. Court No.

19-00042, Def.'s Mem. Opp'n Pl.'s Consol. Pls.' R. 56.2 Mot. J. Agency at 19–22,

ECF Nos. 59, 60.  The Court is not convinced that Commerce's prior

determinations of no countervailable benefits in three administrative reviews were

"mistakes." It appears that Commerce's purported "mistakes" are excuses for Commerce's abrupt change in agency practice here in the fourth administrative review.

As for Commerce's determination that the private investor participation was not "significant" in the first three debt-to-equity restructurings, Commerce claimed that its practice "is to conduct the analysis from the perspective of an outside investor, and not an existing investor that is simply trying to minimize its losses." Remand Redetermination at 11. Further:

> If [Commerce] determines that the firm was equityworthy, [Commerce] will apply paragraph (a)(5) of [19 C.F.R. § 351.507] to determine whether the equity infusion was inconsistent with the usual investment practice of private investors. A determination by [Commerce] that the firm was unequityworthy will constitute a determination that the equity infusion was inconsistent with usual investment practice of private investors . . . .

Id. (quoting 19 C.F.R. § 351.507(a)(3)).

Here, however, Commerce determined that the debt-to-equity infusion was inconsistent with the usual investment practice of private investors in order to determine that KG Dongbu was unequityworthy. Commerce's regulation provides that it "will not use private investor prices . . . if [it] concludes that private investor purchases of newly issued shares are not significant." 19 C.F.R. § 351.507(a)(2)(iii). Commerce created this "significant investment" standard when promulgating 19 C.F.R. § 351.507(a)(2)(iii) by stating that it was keeping its

practice of considering "the volume of a firm's traded shares to be so low as to preclude the use of [private investor] shares as a benchmark." <u>Countervailing Duties</u>, 62 Fed. Reg. 8818, 8832 (Dep't of Commerce Feb. 26, 1997) (notice of proposed rulemaking and request for public comments).

Substantial evidence does not support Commerce's remand determination that private investor participation in the first three debt-to-equity restructurings was not significant.  Based on the same record evidence, Commerce determined in the prior administrative reviews that the private creditors in the debt-to-equity swaps were significant.  Equity Infusions Analysis Mem. at 4–8.  Commerce also reached the same conclusion in a separate proceeding that involved comparable private investor participation.  <u>See</u> <u>Coated Free Sheet Paper from the Republic of Korea</u>, 72 Fed. Reg. 60,639 (Dep't of Commerce Oct. 25, 2007) (notice of final affirmative countervailing duty determination) and accompanying Issues and Decision Memorandum at 47.

The Court notes that the first three administrative reviews are complete, and it is arbitrary for Commerce to revisit and attempt to reverse the determinations in those completed administrative reviews retroactively without citing new evidence. Commerce may address any relevant evidence in the fourth administrative review before the Court, and any determinations made with respect to the fourth administrative review must be supported by substantial evidence and in accordance

with law.  Commerce may not attempt to reverse the countervailability

determinations on the first three administrative reviews in this case absent new

information to address fraud or mistake of fact.  In addition, Commerce may not

pass through the purportedly countervailable benefits to the first three years

without substantial new evidence to justify such calculations.

The Court holds that Commerce's remand redetermination with respect to

the countervailability of the debt-to-equity restructurings is unsupported by

substantial evidence and is remanded for further consideration in accordance with

this Opinion.

### III.  Pass-Through of Benefits from First Three Debt Restructurings

The Court also remanded the issue of whether substantial evidence supports

Commerce's determination that a change in ownership extinguished any alleged

subsidies from the first through third debt-to-equity restructurings to KG Dongbu.

KG Dongbu I, 47 CIT at __, 648 F. Supp. 3d at 1360.

In its Remand Redetermination, Commerce repeated its position that KG

Dongbu's failure to submit the Change-in-Ownership Appendix ("CIO Appendix")

was fatal.  Remand Redetermination at 12–13.  Commerce cited to its instructions

in the Initial Questionnaire requesting the submission of a CIO Appendix if the

respondent wanted to challenge the baseline presumption that non-recurring

subsidies continued to benefit the recipient even after a change in ownership.  Id. at

12.  Without a response to the questions in the CIO Appendix, Commerce

purported to follow its "practice to presume that any benefits to the company will

also pass through as a benefit to the new owners."  Id. at 13.  Further, Commerce

argued that because KG Dongbu stated that it did not wish to challenge the

baseline presumption and did not provide a response to the CIO Appendix, KG

Dongbu's response relieved Commerce of the obligation to consider the record

evidence showing that the alleged non-recurring subsidies from the first three debt-

to-equity restructurings were extinguished.  Id. at 13–14.  The Court concludes that

Commerce's explanation is not reasonable and is not responsive to the prior

remand Order.

 KG Dongbu contends that, first, at the time that it responded to Commerce's

Initial Questionnaire and subsequent supplemental questionnaires, all of the

subsidies that Commerce had found in prior reviews with respect to KG Dongbu

were from other programs that provided recurring subsidies.  See KG Dongbu's

Cmts. at 11.  KG Dongbu argues that Commerce had not found benefits from any

programs in which the benefit was calculated based on the allocation of a non-

recurring subsidy received in the average useful life period to current and future

reviews.  Id.  KG Dongbu also asserts that this necessarily means that even though

Dongbu Steel had been acquired by the KG Consortium, the question of whether

there were any programs that provided non-recurring benefits that may have passed

through to KG Dongbu was not an issue at the time of the questionnaire response

process.  Id. at 11–12.  KG Dongbu asserts further that it was not required to

predict that Commerce would change its mind in the 2019 administrative review

and would determine retroactively that the first through third debt-to-equity

restructurings conferred non-recurring benefits to KG Dongbu.  Id. at 12.  The

Court agrees with KG Dongbu's argument that KG Dongbu had no reason to

submit the CIO Appendix to challenge Commerce's baseline presumption

regarding non-recurring subsidies based on unforeseeable actions that Commerce

would take in the future to attempt to reverse prior concluded administrative

reviews.

Second, KG Dongbu argues that for Commerce to claim that it "properly

presumed that any non-recurring benefit would pass through to the new owners"

because KG Dongbu did not initially challenge the baseline presumption by

submitting a CIO Appendix is to elevate form over substance.  KG Dongbu's

Cmts. at 13.  The fact that KG Dongbu did not submit a CIO Appendix does not

necessarily mean that there was no other record evidence to challenge Commerce's

baseline presumption.  Id.  If the record reflects that an arm's length transaction

took place at fair market value, the baseline presumption is rebutted, regardless of

the absence of a CIO Appendix.  Id. at 13–14.

Pursuant to 19 U.S.C. § 1677(5)(F), Commerce presumes that a non-recurring subsidy will benefit a recipient over the average useful life of the relevant assets and Commerce thus allocates the subsidy over that allocation.  19 U.S.C. § 1677(5)(F); Notice of Final Modification of Agency Practice Under Section 123 of the Uruguay Round Agreements Act ("Final Modification"), 68 Fed. Reg. 37,125, 37,127 (Dep't of Commerce June 23, 2003).  A respondent may rebut the presumption, however, by demonstrating that a change in ownership occurred in which the former owner sold all or substantially all of a company or its assets, and that the sale was an arm's length transaction for fair market value.  Final Modification, 68 Fed. Reg. at 37,127.  In such situations, the subsidy is reflected in the fair market price of the arm's length transaction and the pre-sale subsidy is extinguished (i.e., does not pass through) as to the new owner.  In the Final Modification, Commerce listed four factors that it would analyze when determining whether the transaction price in an acquisition was arm's length and for fair market value: (1) whether an objective analysis was performed in determining the appropriate sales price; (2) whether any artificial barriers to entry were imposed on potential purchasers that could artificially suppress demand for, or the purchase of, the company; (3) whether the highest bid was accepted; and (4) whether there were committed investment requirements that could serve as a barrier to entry or distort the value that bidders were willing to pay.  Id.

KG Dongbu claims that record evidence demonstrates that all of these elements are met, and that Commerce failed to consider the record evidence.  Id. at 15–17.  First, regarding the objective analysis factor, KG Dongbu claims that: (1) PricewaterhouseCoopers independently analyzed the acquisition proposal from the KG Consortium, including the acquisition price in Scenario 3; (2) PricewaterhouseCoopers compared the proposal with alternative scenarios that assumed the creditors council either made no changes to Dongbu Steel's pre-acquisition structure or liquidated Dongbu Steel; and (3) based on its analysis, PricewaterhouseCoopers concluded that the KG Consortium's proposal had the highest value to the creditors council of the available alternative scenarios and posed less risk than liquidating Dongbu Steel.  Id. at 15 (citations omitted).  KG Dongbu claims that this was an objective analysis.

Second, KG Dongbu claims that there were no artificial barriers to entry because: (1) there was a publication in a newspaper on January 7, 2019, publicizing an investment attraction announcement for an open bidding process that provided equal access and free competition for all interested parties; (2) the purpose of the transaction was the acquisition by a third party of newly issued common stock that would result in the transfer of corporate management rights; and (3) potential investors that submitted the confidentiality agreement form and revealed an intention to bid received a Preliminary Bidding Guide and a Teaser

Memorandum containing private and confidential information of Dongbu Steel to

assist the recipient in making a decision on whether to pursue a further analysis of

Dongbu Steel and submit a preliminary bidding proposal.  Id. at 14–15 (citations

omitted).

    Third, KG Dongbu also claims that (1) the highest bid was accepted in this

bidding process; (2) potential investors showed interest by signing confidentiality

agreements and were allowed access to Dongbu Steel's confidential information;

(3) Dongbu Steel's financial and business information was provided for the

valuation and to determine a reasonable investment amount to take over Dongbu

Steel; and (4) because the financial information covered the period through

September 2018, it fully reflected Dongbu Steel's financial condition after the first

three debt-to-equity restructurings.  Id. at 16–17.  KG Dongbu explains the bidding

and selection process that led to its assumption of Dongbu Steel, including the

evaluation of proposed investment amounts, financial and business plans, and

capacity to close the deal as well as the KG Consortium's appointment of an

independent accounting firm to analyze Dongbu Steel's financial situation before

the KG Consortium's preparation of its business restructuring plan and submission

of its final bidding proposal on March 4, 2019.  Id.  KG Dongbu argues that the

KG Consortium paid in full for the new shares before it assumed control of

Dongbu Steel.  Id. at 17.

Fourth, KG Dongbu argues that there were no committed investment requirements that could serve as a barrier to entry or distort the value that bidders were willing to pay.  Id.

Commerce has not reviewed this record evidence and made any determinations.  Commerce has yet to determine whether this amounts to substantial evidence of an arm's length transaction of Dongbu Steel's assets sold to the KG Consortium.  The Court remands this issue for further explanation or reconsideration in accordance with this Opinion.

## IV.    Calculation of the Uncreditworthiness Benchmark

KG Dongbu challenges Commerce's calculation of the uncreditworthy benchmark rate.  KG Dongbu's Cmts. at 17–21; see 19 C.F.R. § 351.505(a)(3)(iii); 19 C.F.R. § 351.524(d).  Familiarity with the formula, as transcribed in the prior Opinion,[2] is presumed.  See KG Dongbu I, 47 CIT at __, 648 F. Supp. 3d at 1361.

---

[2] "

$$i_b = \left[ \frac{(1 - q_n)(1 + i_f)^n}{(1 - p_n)} \right]^{1/n} - 1$$

where:

$n$ = the term of the loan;
$i_b$ = the benchmark interest rate for uncreditworthy companies;
$i_f$ = the long-term interest rate that would be paid by a creditworthy company;
$p_n$ = the probability of default by an uncreditworthy company within n years; and
$q_n$ = the probability of default by a creditworthy company within n years."

This Court previously noted that the extension of the repayment date on KG

Dongbu's loans was to December 31, 2025, and that the fifteen-year average useful

life of the equity infusions contradicted Commerce's Final Results.  Id.

In its Remand Redetermination, Commerce continued to use three years for

the term of the loan variable and the creditworthy and uncreditworthy default rates

because there was allegedly no information on the record regarding a six-year

interest rate for a comparable commercial loan and the loans that KG Dongbu

received cannot constitute "comparable commercial loans" pursuant to 19 C.F.R.

§ 351.505(a)(2).  Remand Redetermination at 17.  Specifically, Commerce

reiterated on remand that in its Final Results, it determined that while there were

some private commercial banks involved in the debt restructuring of KG Dongbu,

the restructuring of its debt was not overseen by those private banks.  Id. at 15–16.

Instead, the debt restructuring was controlled by the Creditor Bank Committee

("CBC"), which in turn was controlled by Korean government policy banks such

as the Korea Development Bank.  Id. at 16.  Therefore, Commerce determined that

---

See 19 C.F.R. § 351.505(a)(3)(iii).  This uncreditworthy interest rate formula thus
has four variables: (1) the term of the loan in question ("$n$"); (2) the long-term
interest rate paid by a creditworthy company; (3) the probability of default of a
creditworthy company in "$n$" years; and (4) the probability of default of an
uncreditworthy company in "$n$" years.

the record of this case did not warrant any change from prior administrative reviews.  Id.

More specifically, Commerce determined that the loans from private creditors on the CBC could not be construed as "comparable commercial loans" and used as a commercial benchmark under 19 U.S.C. § 1677(5)(E)(ii) and 19 C.F.R. § 351.505(a)(2), because the CBC was controlled by government policy and special purpose banks.  Id.  Commerce used a three-year AA-rated Korean Won interest rate, published by the Bank of Korea as the long-term interest rate paid by a creditworthy company because it was the only long-term interest rate available on the record.  Id.  Commerce alleged that no other long-term Korean Won interest rates were provided on the record by interested parties in this review.  Id. Furthermore, Commerce explained that:

> [T]he plain language of the [Preamble to Commerce's regulation] dictates that Commerce use the term of the benchmark (in this case, [three] years, from the [three]-year [Korean Won] AA-Corporate Bond Rate from Bank of Korea) to identify both the probability of default by a creditworthy company, and the probability of default by an uncreditworthy company from the Moody's "Average Cumulative Issuer-Weighted Global Default Rates, 1920-2010" table.  Otherwise, if Commerce used the probability of default by an uncreditworthy company within six years for variables $p_n$ and $q_n$ respectively, as the Plaintiffs suggests, the variables would not be on the same basis as the term of the baseline benchmark used for variable if (*i.e.*, [three] years). This would be contrary to Commerce's intention in providing a formula to calculate the benchmark interest rate for an uncreditworthy company, as set out in the <u>Preamble</u>.

Id. at 34 (citing Countervailing Duties, 63 Fed. Reg. 65,348, 65,365 (Dep't of Commerce Nov. 25, 1998)).

The Court concludes that Commerce's explanation is arbitrary. Commerce's determination on remand to use three years for the term of the loan in variable "$n$" and the length of time within which creditworthy and uncreditworthy companies may default for variables "$p_n$" and "$q_n$" is contrary to the plain language of its regulations. See 19 C.F.R. § 351.505(a)(3)(iii). Commerce's explanation does not justify ignoring the plain language of its own regulations, and there is no rational basis for ignoring the actual evidence on the record regarding the term of the loan (i.e., six years) and substituting a pretend term for the sake of consistency. See, e.g., Ereğli Demir ve Çelik Fabrikalari T.A.Ş. v. United States ("Ereğli Demir"), 43 CIT __, __, 415 F. Supp. 3d 1216, 1230 (2019) ("Commerce's determination in the remand proceeding is inconsistent with the plain language of the regulation and, thus, merits no deference."); Guangzhou Jangho Curtain Wall Sys. Eng'g Co. v. United States, 40 CIT __, __, 181 F. Supp. 3d 1265, 1280 (2016) ("Commerce's per se restriction of its scope ruling to a particular interested party rather than to a particular product is contrary to the plain language of the regulation."); Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) ("The agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." (quotations omitted)).

Commerce's regulation specifies that if it finds that a firm that received a

government provided long-term loan was uncreditworthy, it will "normally"

calculate the interest rate "where: $n$ = the term of the loan."  19 C.F.R.

§ 351.505(a)(3)(iii).  The final countervailing duty regulations specify the selection

of the default rates used in calculating an uncreditworthy benchmark, explaining

that Commerce:

> . . . will use the average cumulative default rate for the number of years
> corresponding to the length of the loan, as reported in Moody's study
> of historical corporate bond default rates.  In other words, we would use
> a five-year default rate for a five-year loan, as a [fifteen]-year default
> rate for a [fifteen]-year loan, and so forth.  We believe that <u>using a
> default rate that is directly linked to the term of the loan</u> is a better
> reflection of the risk associated with long- term lending to
> uncreditworthy borrowers.

<u>Countervailing Duties</u>, 63 Fed. Reg. at 65,365 (emphasis added).  In other words, it

is the rate that is to be linked to the term of the loan.  It is not the other way around.

Commerce's rule addresses that the default rate is a measurement of risk and

the level of risk for a company to default within "$n$" years, which can only be

properly calculated using the actual term of the new loan at issue, in this case for

KG Dongbu, six years.  <u>See</u> <u>id.</u>  However, Commerce introduced abnormality into

the equation by imposing, through unnecessary substitution, a condition that was

directly at odds with clear evidence of record.  Commerce has not articulated a

rational basis to ignore an actual data point in favor of a three-year term unrelated

to the term of the actual loan.  Its calculation thus contradicts the plain language of

its own regulations as to the appropriate period for the applicable default rates.

In the absence of substantial evidence to the contrary, the term of the

restructured long-term loans and bonds is six years, and the term of the loan

(variable "$n$") and default rates ("$p_n$" and "$q_n$") used in the calculation must match

the actual six-year term of KG Dongbu's loans and bonds.  Commerce's decision

to ignore the plain requirements of its regulation renders its decision not in

accordance with law.  See Ereğli Demir, 43 CIT at __, 415 F. Supp. 3d at 1230.

Apart from the rate (variable "$i_f$") that Commerce concluded is proper, on

remand, if Commerce reaches this issue again, it must either revise the calculation

of the uncreditworthy benchmark rate (quotient "$i_b$") by using the six-year term and

default rates on the record for variables "$n$," "$p_n$," and "$q_n$" as set out in the plain

language of its regulations, or provide cogent reasoning for adopting any other

alternative calculation.

## V.      Calculation of the Unequityworthy Discount Rate

KG Dongbu challenges Commerce's calculation of the uncreditworthy

benchmark rate.  KG Dongbu's Cmts. at 17–20.

After Commerce determines that a company receives a benefit through an

equity infusion and that the firm is unequityworthy, it will calculate the amount of

the benefit as equal to the amount of the equity infusion.  19 C.F.R.

§ 351.507(a)(4), (6).  Commerce's regulation specifies that Commerce will then allocate the benefit amount conferred by an equity infusion (a non-recurring subsidy) over the same time period as the non-recurring subsidy, in accordance with 19 C.F.R. § 351.524(d).  See 19 C.F.R. § 351.507(c) ("The benefit conferred by an equity infusion shall be allocated over the same time period as a non-recurring subsidy.").

19 C.F.R. § 351.524(d)(1) sets out the formula to be used for allocating non-recurring benefits over time:

$$A_k = \frac{\frac{y}{n} + \left[ y - \left(\frac{y}{n}\right)(k-1) \right] d}{1 + d}$$

Where:
$A_k$ = the amount of the benefit allocated to year $k$,
$y$ = the face value of the subsidy,
$n$ = the [average useful life] . . . ,
$d$ = the discount rate . . . , and
$k$ = the year of allocation, where the year of receipt = 1 and $1 \leq k \leq n$.

19 C.F.R. § 351.524(d)(1).

19 C.F.R. § 351.524(d)(3)(ii) then sets out an exception for selecting the discount rate for uncreditworthy firms.  For such firms, Commerce "will use as a discount rate the interest rate described in 19 C.F.R. § 351.505(a)(3)(iii)" (i.e., it will use the same formula for the calculation of the uncreditworthy benchmark interest rate described above in section III of this Opinion).  19 C.F.R.

§ 351.524(d)(3)(ii).  In other words, the regulations require that Commerce

calculate the unequityworthy discount rate (listed as variable "*d*" in 19 C.F.R.

§ 351.524(d)(1)) using the formula from 19 C.F.R. § 351.505(a)(3)(iii), but it must

use the average useful life period as variable "*n*" as specified in 19 C.F.R.

§ 351.524(d).

   When the creditor's committee met and approved the restructuring of KG

Dongbu's loans, the maturity date of the loans was extended until 2025.  See KG

Dongbu's Cmts. at 19.  The term of KG Dongbu's restructured loans is six years,

from the 2019 extension until the loans mature in 2025.  The term of average

useful life allocation period for non-recurring subsidies is fifteen years.  Id.  The

probabilities of default by creditworthy and uncreditworthy companies on six-year

and fifteen-year loans are on the record.  Id.  The Court also agrees that the

information necessary to calculate the uncreditworthy benchmark rate and

unequityworthy discount rate pursuant to the plain language of 19 C.F.R.

§ 351.505(a)(3)(iii)—the six-year term of KG Dongbu's restructured loans, the

fifteen-year average useful life of the equity infusions, and the probabilities of

default by creditworthy and uncreditworthy companies for six- and fifteen-year

periods—is on the record.

   Because the average useful life period in this case is fifteen years,

Commerce allocated the amounts of the 2015, 2016, 2018, and 2019 government

equity infusions on that basis pursuant to 19 C.F.R. § 351.507(c) and 19 C.F.R.

§ 351.524(b) and (d)(1).  Equity Infusions Analysis Mem. at 21.  However, in

determining the amount of the benefit in each year of the fifteen-year allocation

period, Commerce calculated the discount rates (variable "$d$" in Commerce's

equation) based on a three-year period, and in so doing it applied the formula from

19 C.F.R. § 351.505(a)(3)(iii) incorrectly, as discussed above for the

uncreditworthy benchmark interest rate.  See IDM at 41–42, 59.  Commerce's

regulation and preamble to Commerce's regulations are clear that the default rates

should be tied to the term of the loan or, in the case of an equity benefit, to the

same period as a non-recurring subsidy, *i.e.*, the fifteen-year average useful life

period.  See 19 C.F.R. § 351.524(d)(2); 19 C.F.R. § 351.507(c) ("The benefit

conferred by an equity infusion shall be allocated over the same time period as a

non-recurring subsidy.").

Thus, the "$n$" variable (number of years) in the formula for calculating the

unequityworthy discount rates should match the fifteen-year allocation period, just

as the "$n$" variable for calculating an uncreditworthy benchmark interest rate must

match the term of the uncreditworthy loan.  Because Commerce's Remand

Redetermination contradicts the plain language of Commerce's regulations,

Commerce's determination is not in accordance with law.  See Ereğli Demir, 43

CIT at __, 415 F. Supp. 3d at 1230.  On further remand, Commerce must either

revise the calculation of the unequityworthy discount rates by using the fifteen-year average useful life period and default rates for variables "$n$," "$p_n$," and "$q_n$" as set forth in the regulations, or provide cogent reasoning for adopting any alternative calculation.

## CONCLUSION

Accordingly, it is hereby

**ORDERED** that Commerce's amended Final Results of Redetermination Pursuant to Court Remand, ECF Nos. 57, 58, are remanded to Commerce for reconsideration consistent with this Opinion; and it is further

**ORDERED** that this case shall proceed according to the following schedule:

(1) Commerce shall file the remand determination on or before July 3, 2024;

(2) Commerce shall file the administrative record on or before July 17, 2024;

(3) Comments in opposition to the remand determination shall be filed on or before September 6, 2024;

(4) Comments in support of the remand determination shall be filed on or before October 7, 2024; and

(5) The joint appendix shall be filed on or before October 22, 2024.

/s/ Jennifer Choe-Groves
Jennifer Choe-Groves, Judge


Dated:    April 3, 2024
          New York, New York

Slip Op. 25-7

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **KG DONGBU STEEL CO., LTD., DONGBU STEEL CO., LTD., and DONGBU INCHEON STEEL CO., LTD.,** | |
| **Plaintiffs,** | |
| **v.** | |
| **UNITED STATES,** | **Before: Jennifer Choe-Groves, Judge** |
| **Defendant,** | **Court No. 22-00047** |
| **and** | |
| **NUCOR CORPORATION and STEEL DYNAMICS, INC.,** | |
| **Defendant-Intervenors.** | |

## <u>OPINION AND ORDER</u>

[Sustaining the U.S. Department of Commerce's <u>Final Results of Redetermination Pursuant to Court Remand</u> in the countervailing duty review of certain corrosion-resistant steel products from the Republic of Korea.]

Dated: January 17, 2025

<u>Brady W. Mills</u>, <u>Donald B. Cameron, Jr.</u>, <u>Eugene Degnan</u>, <u>Jordan L. Fleischer</u>, <u>Julie C. Mendoza</u>, <u>Mary Shannon Hodgins</u>, <u>Nicholas C. Duffy</u>, and <u>Rudi W. Planert</u>, Morris, Manning & Martin, LLP, of Washington, D.C., for Plaintiffs KG Dongbu Steel Co., Ltd., Dongbu Steel Co., Ltd., and Dongbu Incheon Steel Co., Ltd.

Claudia Burke, Assistant Director, Elizabeth Speck, Senior Trial Counsel,
Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of
Washington, D.C.  With them on the brief were Brian M. Boynton, Principal
Deputy Assistant Attorney General, and Patricia M. McCarthy, Director.  Of
counsel on the brief was Jack Dunkelman, Attorney, Office of the Chief Counsel
for Trade Enforcement & Compliance, U.S. Department of Commerce, of
Washington, D.C.

Alan H. Price, Adam M. Teslik, Christopher B. Weld, Derick G. Holt, Enbar
Toledano, Maureen E. Thorson, Paul A. Devamithran, Robert E. DeFrancesco, III,
Tessa V. Capeloto, and Theodore P. Brackemyre, Wiley Rein LLP, of Washington,
D.C., for Defendant-Intervenor Nucor Corporation.

Roger B. Schagrin, Alessandra A. Palazzolo, Christopher T. Cloutier, Elizabeth J.
Drake, Jeffrey D. Gerrish, Luke A. Meisner, Michelle R. Avrutin, Nicholas J.
Birch, Saad Y. Chalchal, and William A. Fennell, Schagrin Associates, of
Washington, D.C., for Defendant-Intervenor Steel Dynamics, Inc.

Choe-Groves, Judge: Plaintiffs KG Dongbu Steel Co., Ltd. ("KG Dongbu

Steel"), Dongbu Steel Co., Ltd. ("Dongbu Steel"), and Dongbu Incheon Steel Co.,

Ltd. (collectively, "Plaintiffs" or "KG Dongbu") filed this action challenging the

U.S. Department of Commerce's ("Commerce") fourth administrative review of

Certain Corrosion-Resistant Steel Products from the Republic of Korea ("Final

Results"), 87 Fed. Reg. 2759 (Dep't of Commerce Jan. 19, 2022) (final results and

partial rescission of countervailing duty administrative review; 2019), and the

accompanying Issues and Decision Memorandum for the Final Results and Partial

Rescission of the 2019 Administrative Review of the Countervailing Duty Order

on Certain Corrosion-Resistant Steel Products from the Republic of Korea

("IDM"), PR 213.[1]  In <u>KG Dongbu Steel Co., Ltd. v. United States</u> ("<u>KG Dongbu</u>

<u>II</u>"), 48 CIT __, 695 F. Supp. 3d 1338 (2024), the Court remanded the case to

Commerce for a second time for reconsideration and further discussion.  <u>KG</u>

<u>Dongbu II</u>, 48 CIT at __, 695 F. Supp. 3d at 1356–57.  Now before the Court is

Commerce's Final Results of Redetermination Pursuant to Court Remand

("<u>Second Remand Redetermination</u>").  Commerce's Final Results Redetermination

Pursuant Ct. Remand, ECF Nos. 76-1, 77-1; 2PRR 5.  For the following reasons,

the Court sustains Commerce's <u>Second Remand Redetermination</u>.

## ISSUES PRESENTED

The Court reviews the following issues:

1. Whether Commerce's determination that the first through third

   debt-to-equity restructurings did not provide a countervailable

   benefit to KG Dongbu is supported by substantial evidence and in

   accordance with law;

2. Whether Commerce's determination that the issue whether benefits

   from the debt-to-equity restructurings passed through to KG

   Dongbu Steel despite a change in ownership is moot;

---

[1] Citations to the administrative record reflect the public record ("PR"), public remand record ("PRR"), and second public remand record ("2PRR") numbers filed in this case, ECF Nos. 44, 71, 87.

3.  Whether Commerce's calculations of the uncreditworthy

benchmark rates are supported by substantial evidence; and

4.  Whether Commerce's calculation of the unequityworthy discount

rate is supported by substantial evidence.

## BACKGROUND

The Court presumes familiarity with the facts and procedural history of this

case and recites the facts relevant to the Court's review of the <u>Second Remand</u>

<u>Redetermination</u>.  <u>See</u> <u>KG Dongbu II</u>, 48 CIT at __, 695 F. Supp. 3d at 1342–44;

<u>KG Dongbu Steel Co., Ltd. v. United States</u> ("<u>KG Dongbu I</u>"), 47 CIT __, __, 648

F. Supp. 3d 1353, 1356 (2023).

Commerce published its countervailing duty order on July 25, 2016.  <u>Certain</u>

<u>Corrosion-Resistant Steel Products from India, Italy, Republic of Korea and the</u>

<u>People's Republic of China</u>, 81 Fed. Reg. 48,387 (Dep't of Commerce July 25,

2016) (countervailing duty order).  Commerce initiated an administrative review of

the countervailing duty order on certain corrosion-resistant steel products from the

Republic of Korea ("Korea") for the period of January 1, 2019 to December 31,

2019 and selected KG Dongbu and Hyundai Steel Company as mandatory

respondents.  <u>Initiation of Antidumping and Countervailing Duty Administrative</u>

<u>Reviews</u>, 85 Fed. Reg. 54,983, 54,990–91 (Dep't of Commerce Sept. 3, 2020);

<u>Final Results</u>, 87 Fed. Reg. at 2760.

Commerce issued the preliminary results of the administrative review, in which Commerce calculated a 10.52% subsidy rate for KG Dongbu.  Certain Corrosion-Resistant Steel Products from the Republic of Korea ("Preliminary Results"), 86 Fed. Reg. 37,740 (Dep't of Commerce July 16, 2021) (preliminary results of countervailing duty administrative review; 2019); Decision Memorandum for the Preliminary Results of the Countervailing Duty Administrative Review; 2019: Certain Corrosion-Resistant Steel Products from the Republic of Korea ("PDM"), PR 173.  Commerce issued the Final Results of the administrative review, in which Commerce calculated a 10.51% subsidy rate for KG Dongbu and assigned the same rate to non-selected companies.  Final Results, 87 Fed. Reg. at 2760.

On appeal, Plaintiffs challenged: (1) Commerce's determination that the first through third debt-to-equity restructurings provided a countervailable subsidy; (2) Commerce's determination that the sale of Dongbu Steel was not arm's length for fair market value; (3) Commerce's calculation of the uncreditworthiness benchmark for purposes of measuring the benefit from KG Dongbu's restructured long term loans and bonds; and (4) Commerce's calculation of the unequityworthy discount rate for purposes of measuring the benefits from the equity infusions from government-controlled creditors.  Pls.' Mot. J. Agency R., ECF Nos. 33, 34; Pls.' Opening Br., ECF Nos. 33-2, 34-2; Reply Br. Pls.' Supp. Mot. J. Agency R., ECF

Nos. 40, 41.  Defendant United States ("Defendant") and Defendant-Intervenor

Nucor Corporation ("Defendant-Intervenor" or "Nucor") argued that the Court

should sustain the Final Results.  Def.'s Resp. Pls.' Mot. J. Agency R., ECF Nos.

35, 36; Def.-Interv.'s Resp. Mot. J. Agency R., ECF Nos. 37, 38, 39.

      The Court observed that Commerce had considered the first through third

debt-to-equity restructurings in each of the first three administrative reviews of the

countervailing duty order.  KG Dongbu I, 47 CIT at __, 648 F. Supp. 3d at 1358.

In each of the three prior administrative reviews, Commerce had determined that

the debt-to-equity restructurings did not provide a countervailable benefit to KG

Dongbu because private creditors had participated in those debt-to-equity

restructurings and had agreed to swap debt for equity on the same terms as the

government creditors.  Certain Corrosion-Resistant Steel Products from the

Republic of Korea, 84 Fed. Reg. 11,749 (Dep't of Commerce Mar. 28, 2019) (final

results and partial rescission of countervailing duty administrative review; 2015–

2016) and accompanying Issues and Decision Memorandum; Certain Corrosion-

Resistant Steel Products from the Republic of Korea, 85 Fed. Reg. 15,112 (Dep't

of Commerce Mar. 17, 2020) (final results of countervailing duty administrative

review; 2017) and accompanying Issues and Decision Memorandum; Certain

Corrosion-Resistant Steel Products from the Republic of Korea, 86 Fed. Reg.

29,237 (Dep't of Commerce June 1, 2021) (final results and partial rescission of

countervailing duty administrative review; 2018) and accompanying Issues and

Decision Memorandum.  Commerce did not conduct an unequityworthiness

analysis in any of those first three administrative reviews.

The fourth administrative review also involved a fourth debt-to-equity

restructuring.  See IDM at 15.  Commerce determined that the evidence showed

that private banks had (1) participated in the three debt-to-equity restructurings at

issue, (2) paid the same per share price as the government-controlled policy banks,

and (3) purchased a significant percentage of the shares of debt that were converted

to equity.  Countervailing Duty Administrative Review of Certain Corrosion-

Resistant Steel Products from the Republic of Korea: Preliminary Analysis

Memorandum—Equity Infusions ("Equity Infusions Analysis Memorandum" or

"Equity Infusions Analysis Mem."), PR 176; see also PDM at 11–12.  Commerce

thus determined that, pursuant to 19 C.F.R. § 351.507(a)(2)(i), the equity infusions

in the fourth debt-to-equity restructuring were inconsistent with usual investment

practices of private investors.  Equity Infusions Analysis Mem. at 13.

During the fourth administrative review, Commerce re-examined the first

three debt-to-equity restructurings, determined that KG Dongbu was

unequityworthy at their respective placements, and determined that the

restructurings had in fact provided a benefit each time to KG Dongbu, as detailed

in the Equity Infusions Analysis Memorandum.  Id. at 10–13.  Commerce

determined that the benefits of the first through third debt-to-equity restructurings were countervailable because Commerce previously determined that those debt restructurings satisfied the specificity requirement of countervailability.  IDM at 46–47; see 19 U.S.C. § 1677(5A).

Upon consideration of Plaintiffs' appeal, this Court concluded that Commerce had a standard practice of not reexamining the countervailability of a respondent's equity infusions absent new information and had not provided a reasonable explanation for departing from that practice, and the Court remanded the Final Results for reconsideration or further explanation.  KG Dongbu I, 47 CIT at __, 648 F. Supp. 3d at 1357–59.  This Court reasoned that all the information cited by Commerce regarding the first through third debt-to-equity restructurings was based on existing record evidence that had been thoroughly considered in the previous reviews and that no new information impacted the facts surrounding the fourth debt-to-equity restructuring.  Specifically, "the record evidence cited by Commerce as justification for its deviation from its past practice does not deal directly with the first through third debt-to-equity restructurings and is not a sufficient explanation to justify departing from its standard practice."  Id. at __, 648 F. Supp. 3d at 1359.  The fourth administrative review was based on the same record as the first through third reviews, and thus Commerce did not provide a

sufficient explanation or cite new substantial evidence to justify departing from the

prior three reviews in the fourth administrative review.

The Court remanded for Commerce to reconsider or further explain: (1) its

determination that the first through third debt-to-equity restructurings provided a

countervailable benefit; (2) its determination that the benefits from the debt-to-

equity restructurings "passed through" to Plaintiffs despite the change in

ownership; (3) whether Commerce's calculations of the uncreditworthy benchmark

rates are supported by substantial evidence; and (4) whether Commerce's

calculation of the unequityworthy discount rate is supported by substantial

evidence.  Id. at __, 648 F. Supp. 3d at 1357–61.

Commerce filed its First Remand Redetermination maintaining that all of its

original determinations were correct.  Commerce's Final Results Redetermination

Pursuant Ct. Remand ("First Remand Redetermination"), ECF Nos. 57-1, 58-1.  In

summary, Commerce reiterated on remand that Commerce was attempting to fix in

the fourth administrative review a "mistake" that it had made in the three prior

administrative reviews, but Commerce again failed to cite substantial record

evidence or provide an adequate explanation for departing from its prior

determinations that the first three debt-to-equity restructurings did not provide

countervailable benefits.  Id. at 18–25.  In addition, Commerce explained on

remand that it would assess countervailable benefits as a pass-through for the prior

three years of review (despite its prior determinations that Commerce would not

countervail benefits in the first three years of review), plus countervailable benefits

for the fourth year of review, without citing substantial record evidence or

providing an adequate explanation for this change in practice.  Id. at 25–32.

With respect to the First Remand Redetermination, the Court held that

Commerce's determinations regarding the countervailability of the debt-to-equity

restructurings and whether the change in ownership extinguished any alleged

subsidies from the first through third debt-to-equity restructurings to KG Dongbu

were unsupported by substantial evidence.  KG Dongbu II, 48 CIT at __, 659 F.

Supp. 3d at 1345–53.  The Court found further that Commerce's calculations of the

uncreditworthiness benchmark and unequityworthy discount rate were arbitrary

and inconsistent with the plain language of the applicable regulations.  Id. at __,

659 F. Supp. 3d at 1353–56.  The Court remanded Commerce's First Remand

Redetermination for Commerce to reconsider its determination or provide

additional explanation.  Id. at __, 659 F. Supp. 3d at 1356–57.

Commerce filed its Second Remand Redetermination under protest.  Second

Remand Redetermination at 2.  Commerce determined that no benefit was

conferred through the first through third debt-to-equity restructurings.  Id. at 5–6,

15–16.  Because no benefit was conferred through the debt-to-equity

restructurings, Commerce concluded that the issue whether benefits passed through

to KG Dongbu Steel was moot. <u>Id.</u> at 8, 16–17.  Commerce revised its calculations

of the uncreditworthy benchmark interest rates based on a three-year AA-rated

Korean won interest rate, the actual duration of each loan, and the default rates for

each loan. <u>Id.</u> at 10–12, 17–19.  Commerce revised its calculation of the

unequityworthy discount rate based on a 15-year average useful life. <u>Id.</u> at 13–14,

17–19.

Defendant-Intervenor filed Defendant-Intervenor's Comments in Opposition

to Second Remand Redetermination.  Def.-Interv.'s Comments Opp'n Second

Remand Redetermination ("Def.-Interv.'s Br."), ECF Nos. 81, 82.  In support of

the <u>Second Remand Redetermination</u>, Plaintiffs filed Plaintiffs' Comments in

Support of the Second Remand Redetermination and Defendant filed Defendant's

Response to Comments on Commerce's Second Remand Redetermination.  Pls.'

Comments Supp. Second Remand Redetermination ("Pls.' Br."), ECF No. 84;

Def.'s Resp. Comments Commerce's Second Remand Redetermination ("Def.'s

Br."), ECF No. 85.

## JURISDICTION AND STANDARD OF REVIEW

The U.S. Court of International Trade has jurisdiction pursuant to 19 U.S.C.

§ 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), which grant the Court authority to

review actions contesting the final results in an administrative review of a

countervailing duty order.  The Court shall hold unlawful any determination found

to be unsupported by substantial evidence on the record or otherwise not in

accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  The Court reviews

determinations made on remand for compliance with the Court's remand order.

Ad Hoc Shrimp Trade Action Comm. v. United States, 38 CIT 727, 730, 992 F.

Supp. 2d 1285, 1290 (2014), aff'd, 802 F.3d 1339 (Fed. Cir. 2015).

## DISCUSSION

### I.    Countervailable Subsidy Overview

A countervailable subsidy exists when a foreign government provides a

financial contribution that confers a benefit upon the recipient which is deemed to

be specific.  19 U.S.C. § 1677(5) & (5A).  For equity infusions, a benefit is

conferred if the investment decision is inconsistent with the usual investment

practice of private investors, including the practice regarding the provision of risk

capital, in the country in which the equity infusion is made.  19 U.S.C.

§ 1677(5)(E)(i); see also 19 C.F.R. § 351.507(a)(1) (defining a benefit for equity

infusions).

Commerce will consider an equity infusion as being inconsistent with usual

investment practice if the price paid by the government for newly issued shares is

greater than the price paid by private investors for the same (or similar form of)

newly issued shares.  19 C.F.R. § 351.507(a)(2)(i).  Commerce will not consider

private sector investor prices if Commerce concludes that private investor

purchases of newly issued shares are not significant.  Id. § 351.507(a)(2)(iii).  In

such cases when significant private sector participation does not exist, Commerce

will determine whether the firm funded by the government-provided equity was

equityworthy or unequityworthy at the time of the equity infusion.  Id.

§ 351.507(a)(3).  A determination that the firm was unequityworthy will constitute

a determination that the equity infusion was inconsistent with the usual investment

practice of private investors, and, therefore, that a benefit to the firm exists in the

amount of the equity infusion.  Id.; see also id. § 351.507(a)(6).

Commerce will consider a firm to have been equityworthy if Commerce

determines that, from the perspective of a reasonable private investor examining

the firm at the time the government-provided equity infusion took place, the firm

showed an ability to generate a reasonable rate of return within a reasonable period

of time.  Id. § 351.507(a)(4)(i).  In making this determination, Commerce considers

the following factors: (A) an objective analysis of the future financial prospects of

the recipient firm, (B) current and past indicators of the recipient firm's financial

health, (C) rates of return on equity in the three years prior to the government

equity infusion, and (D) private investor equity investment into the recipient firm.

Id. § 351.507(a)(4)(i)(A)–(D).  Commerce may, in appropriate circumstances,

focus on the equityworthiness of a specific project, rather than the company as a

whole.  Id. § 305.507(a)(4)(i).

## II.    First Through Third Debt-to-Equity Restructurings

In <u>KG Dongbu II</u>, the Court held that Commerce's reversal of its prior

determinations that the first through third debt-to-equity restructurings provided no

counteravailable benefits was arbitrary and unsupported by record evidence.  <u>KG</u>

<u>Dongbu II</u>, 48 CIT at __, 695 F. Supp. 3d at 1350.  The Court explained that

"Commerce may not attempt to reverse the countervailability determinations on

the first three administrative reviews in this case absent new information to address

fraud or mistake of fact" and "may not pass through the purportedly

countervailable benefits to the first three years without substantial new evidence to

justify such calculations."  <u>Id.</u>  On second remand, Commerce determined that

there exists "no other basis on the record to conclude that a benefit was conferred

on Dongbu Steel's first through third debt-to-equity infusions."  <u>Second Remand</u>

<u>Redetermination</u> at 6.

Commerce conducted the remand under protest because it "disagree[s] with

the Court that benefit cannot be re-evaluated during each [period of review]."  <u>Id.</u>

Defendant-Intervenor raises a similar argument in opposition to the <u>Second</u>

<u>Remand Redetermination</u> that Commerce has the inherent authority to reconsider

its prior determinations, even in the absence of new information.  Def.-Interv.'s Br.

at 2.  In <u>KG Dongbu II,</u> the Court acknowledged that Commerce has the authority

to reconsider its prior decisions if there is no specific statutory limitation against

doing so.  KG Dongbu II, 48 CIT at __, 695 F. Supp. 3d at 1347 (citing Tokyo

Kikai Seisakusho, Ltd. v. United States, 529 F.3d 1352, 1560 (Fed. Cir. 2008)).

However, this authority is not absolute and Commerce must provide an

explanation for treating similar situations differently and for deviating from its

established practices.  Id. (citing SKF USA Inc. v. United States, 263 F.3d 1369,

1382 (Fed. Cir. 2001)).

Commerce cites to PPG Industries, Inc. v. United States ("PPG Industries"),

978 F.2d 1232 (Fed. Cir. 1992), in support of its contention that the U.S. Court of

Appeals for the Federal Circuit "has recognized that Commerce can revisit any

potential benefits received during the administrative [period of review]."  Second

Remand Redetermination at 6.  The reason for Commerce's reliance on this case is

not clear.  PPG Industries considered, in relevant part, whether parties to a

suspension agreement received prohibited countervailable subsidies during a

period of review.  PPG Indus., 978 F.2d at 1237–39.  Commerce quotes the

language "the relevant inquiry is whether or not [Flatado and Plano] received any

benefits during the period of review . . . ."  Second Remand Redetermination at 6

n.28 (quoting PPG Indus., 978 F.2d at 1237).  Commerce ignores the beginning of

the quoted sentence that provides the qualifying text: "[b]ecause we are reviewing

compliance with the suspension agreement."  PPG Indus., 978 F.2d at 1237.  Even

if not limited to the context of suspension agreements, nothing in PPG Industries,

or any other case of which the Court is aware, stands for the broad proposition that

Commerce has unfettered authority to revise its prior determinations without

providing an adequate explanation or citing new evidence as required by SKF USA

Inc. v. United States, 263 F.3d 1369 (Fed. Cir. 2001).

      Defendant-Intervenor challenges the Second Remand Redetermination,

contending that Commerce failed to address on remand evidence on the record

submitted by Defendant-Intervenor that supports a revision of Commerce's prior

debt-to-equity determinations.  Def.-Interv.'s Br. at 3–5.  Specifically, Defendant-

Intervenor asserts that it previously raised before Commerce evidence of a Korean

Government policy to influence non-government financial institutions that actively

support debt restructuring for Korean companies.  Id. at 3–4.  During the

investigation, Defendant-Intervenor argued to Commerce that the Korean

Government established the United Asset Management Company, Ltd.

("UAMCO") "to achieve financial improvement of struggling companies through a

wide range of restructuring programs, including debt restructuring, capital

injection, asset sales, corporate reorganization, workouts and liquidation and

bankruptcy proceedings."  Def.-Interv.'s Comments Advance Prelim.

Determination Regarding Dongbu at 21, PR 163 (citing Def.-Interv.'s Comments

Dongbu's First Suppl. Questionnaire Resp. at Ex. 26 at 35, PR 110–13).

Defendant-Intervenor asserted that KG Dongbu's restructuring was connected to

UAMCO's expansion and quoted a statement by a financial institution stating that "the [Korean Government] may from time to time encourage or request the financial institutions in Korea, including us and our subsidiaries, to make investments in, or to provide other forms of financial support to, certain institutions in furtherance of the Government's policy objectives." Id. at 22 (citing Def.-Interv.'s Comments Dongbu's First Suppl. Questionnaire Resp. at Ex. 26 at 34). Defendant-Intervenor argued to Commerce that there was evidence that the Korean Government directed KG Dongbu's creditors or that non-governmental banks were not sufficiently independent of government influence. Id at 24. Defendant-Intervenor contends that it raised this evidence before Commerce on remand. Def.-Interv.'s Br. at 5.

Commerce "must address significant arguments and evidence which seriously undermines its reasoning and conclusions," but is not required to address every argument or piece of evidence offered by a party. Altx, Inc. v. United States, 25 CIT 1100, 1117–18, 167 F. Supp. 2d 1353, 1374 (2001), aff'd 370 F.3d 1108, 1116 (Fed. Cir. 2004). On second remand, Commerce explained that it "[found] no other basis on the record to conclude that a benefit was conferred on Dongbu Steel's first through third debt-to-equity infusions." Second Remand Redetermination at 6, 16. This suggests that Commerce reviewed the full record on remand to identify any evidence that might support a determination that a

benefit was conferred through the debt-to-equity infusions, as the Court instructed in KG Dongbu II.

Furthermore, the evidence cited by Defendant-Intervenor does not directly undermine Commerce's determination on second remand.  A benefit is conferred "if the investment decision is inconsistent with the usual investment practice of private investors, including the practice regarding the provision of risk capital, in the country in which the equity infusion is made[.]"  19 U.S.C. § 1677(5)(E)(i); see also 19 C.F.R. § 351.507(a)(1).  The Court observes that Defendant-Intervenor offered the cited evidence to Commerce in support of its argument "that the non-government banks on the creditor committees were entrusted and directed to participate" and that Commerce "should reconsider prior determinations that the non-government banks were 'actual private investors' for the purpose of benchmarking the debt-to-equity swap portion of the restructuring."  Def.-Interv.'s Comments Advance Prelim. Determination Regarding Dongbu at 24.  Though the evidence identified by Defendant-Intervenor might suggest a general government policy to pressure non-governmental institutions to participate in debt restructuring, the evidence does not directly support a determination that such pressure was actually exerted in KG Dongbu's debt-to-equity restructurings.

The Court presumes that Commerce considered the full record, including all evidence cited by Defendant-Intervenor, and decided to reject such evidence in

Commerce's determination.  The Court does not conclude that Commerce was required in the <u>Second Remand Redetermination</u> to expressly address Defendant-Intervenor's arguments and cited evidence, and the Court will not require Commerce to do so in a third remand redetermination.

In <u>KG Dongbu II</u>, the Court remanded Commerce's countervailability determination by stating that "Commerce failed to provide a reasonable explanation and failed to cite new information or a mistake of fact regarding the first three administrative reviews that would warrant reversing Commerce's prior final determinations that the first three debt-to-equity restructurings resulted in no countervailable benefits."  <u>KG Dongbu II</u>, 48 CIT at __, 695 F. Supp. 3d at 1348. This Court explained that "[t]he only reason for Commerce to re-examine the countervailability of the prior debt-to-equity restructurings is 'new information,' according to [Commerce's] own statements."  <u>Id.</u> at 1347.  Commerce previously stated that it had made a "mistake," and therefore the Court remanded for Commerce to provide further explanation about the new information and the mistake that it had made.

On second remand, rather than providing more detail about the alleged "mistake" and any related "new information" under its own policies, Commerce reversed course and determined that no evidence on the record supported a conclusion that a benefit was conferred by the first through third debt-to-equity

restructurings.  Second Remand Redetermination at 6, 16.  Commerce had the

choice to either explain its "mistake" or to examine the full record and change its

position.  Commerce chose the latter approach, and determined that the record

evidence did not support countervailability determinations for the first three

administrative reviews.

The Court holds that Commerce's second remand redetermination is in

accordance with law, supported by substantial evidence, and in accordance with

the remand instructions.  Accordingly, the Court sustains Commerce's

determination that no benefit was conferred in the first through third debt-to-equity

restructurings.

### III.   Pass Through Benefits

On second remand, Commerce determined that because KG Dongbu's first

through third debt-to-equity restructurings did not confer a benefit and that there

was not a recurring benefit to be allocated during the 2019 administrative review,

the issue whether the benefits passed through to KG Dongbu Steel was moot.

Second Remand Redetermination at 8, 16–17.  Plaintiffs support Commerce's

determination that the issue is moot.  Pls.' Br. at 8–9.  No party objects to the

determination of mootness.  Def.'s Br. at 6; see also Def.-Interv.'s Br.  The Court

agrees that Commerce's determination that no benefit was conferred in the first

through third debt-to-equity restructurings renders moot the issue whether a benefit

passed through to KG Dongbu Steel.  The Court sustains Commerce's

determination.

### IV.    Uncreditworthy Benchmark Rate

On second remand, Commerce reconsidered its calculations of the

uncreditworthy benchmark used to calculate the benefits for bonds and loans

provided by the Creditor Bank Committee.  Second Remand Redetermination at

10–12.  In KG Dongbu II, the Court explained that "Commerce's regulation and

preamble to Commerce's regulations are clear that the default rates should be tied

to the term of the loan or, in the case of an equity benefit, to the same period as a

non-recurring subsidy[.]"  KG Dongbu II, 48 CIT at__, 695 F. Supp. 3d at 1356

(citing 19 C.F.R. § 351.524(d)(2); 19 C.F.R. § 351.507(c)).

Commerce identified that the uncreditworthy interest rate formula has four

variables, (1) the term of the loan in question "n"; (2) the long-term interest rate

paid by a creditworthy company "$i_f$"; (3) the probability of default of a

creditworthy company in "n" years; and (4) the probability of default of an

uncreditworthy company in "n" years.  Second Remand Redetermination at 10

(citing 19 C.F.R. § 351.505(a)(3)(iii)).  In applying this formula, Commerce used

the bond and loan template provided by KG Dongbu and explained that:

> [p]ursuant to 19 [C.F.R. §] 351.505(a)(2)(iii), we determined the
> term of each bond or loan, "n," by identifying the "Date of Loan
> Receipt" and the loan's "Date of Maturity."  To identify the six-

> year loans and bonds that were restructured in 2019, we
> identified the new interest rate of the restructured bond or loan
> (under the labels "Interest Rate Specified in the Loan
> Agreement" or "Coupon Rate (%)"), the year the loan appeared
> to be restructured as a "new" loan using the column labelled
> "Date of Interest Payment," and the "Date of Maturity."

Id. at 11–12.  Commerce revised its uncreditworthy benchmark interest rate

calculations based on the duration of each bond or loan and applied the calculated

interest rates to the bonds and loans that had remaining balances during the period

of review.  Id. at 10–12.

Commerce's recalculation of the uncreditworthy benchmarks is consistent

with the Court's remand instructions.  No party objects to the calculations.  Pls.'

Br. at 9–10; Def.'s Br. at 10; see Def.-Interv.'s Br.  The Court sustains the

uncreditworthy benchmark calculations.

## V.    Unequityworthy Discount Rate

In KG Dongbu II, the Court held that 19 C.F.R. §§ 351.507(c) and

351.524(d) require that Commerce "allocate the benefit amount conferred by an

equity infusion (a non-recurring subsidy) over the same time period as the non-

recurring subsidy" when calculating an unequityworthy discount rate.  KG Dongbu

II, 48 CIT at __, 695 F. Supp. 3d at 1355.  On second remand, Commerce

recalculated the uncreditworthy discount rate using a 15-year average useful life

and the formula for calculating the uncreditworthy interest rate.  Second Remand

Redetermination at 13–14.  The recalculated rate was applied to the allocation of KG Dongbu's fourth debt-to-equity restructuring and the subsidy rate for the 2019 period of review was revised.  Id. at 14.

Commerce's recalculation of the unequityworthy discount rate is consistent with the Court's remand instructions.  No party objects to the calculations.  Pls.' Br. at 9–10; Def.'s Br. at 10; see Def.-Interv.'s Br.  The Court sustains the unequityworthy discount rate calculation.

## CONCLUSION

For the foregoing reasons, the Court sustains Commerce's Second Remand Redetermination as supported by substantial evidence and in accordance with law. Accordingly, it is hereby

**ORDERED** that Second Remand Redetermination is sustained.

Judgment will be entered accordingly.

                                        /s/ Jennifer Choe-Groves
                                    Jennifer Choe-Groves, Judge

Dated:   January 17, 2025
            New York, New York

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **KG DONGBU STEEL CO., LTD., DONGBU STEEL CO., LTD., AND DONGBU INCHEON STEEL CO., LTD.,**<br><br>     **Plaintiffs,**<br><br>v.<br><br>**UNITED STATES,**<br><br>     **Defendant,**<br><br>and<br><br>**NUCOR CORPORATION AND STEEL DYNAMICS, INC.,**<br><br>     **Defendant-Intervenors.** | Before: Jennifer Choe-Groves, Judge<br><br>Court No. 22-00047 |

## <u>JUDGMENT</u>

This case having been duly submitted for decision, and the Court, after due deliberation, having rendered a decision; now therefore, in conformity with said decision, it is hereby

**ORDERED** that the U.S. Department of Commerce's final determination in <u>Certain Corrosion-Resistant Steel Products from the Republic of Korea</u> ("<u>Final Results</u>"), 87 Fed. Reg. 2759 (Dep't of Commerce Jan. 19, 2022) (final results and partial rescission of countervailing duty administrative review; 2019), <u>as amended</u>

Court No. 22-00047                                                                 2

by, the Final Results of Redetermination Pursuant to Court Remand, ECF Nos. 57-

1, 58-1, and the Final Results of Redetermination Pursuant to Court Remand, ECF

No. 77-1; 2PRR 5,[1] is sustained.

                                        /s/ Jennifer Choe-Groves
                                    Jennifer Choe-Groves, Judge

Dated:   January 17, 2025
              New York, New York

---

[1] Citation to the administrative record reflects the second public remand record
("2PRR") numbers filed in this case, ECF No. 87.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:**  2025-1411

**Short Case Caption:**  KG Dongbu Steel Co., v. United States

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes _12,000_ words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: _04/07/2025_

Signature:  /s/ Alan H. Price

Name:  Alan H. Price